Joanne DeLong, CA SB #237161
2520 S Street #5
Sacramento, CA 95816
Phone: (916) 452-3410
E-mail: jrdelong@comcast.net

Attorney for Plaintiff Dr. Matthew Bonzani

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **MATTHEW BONZANI, M.D.**<br>Plaintiff,<br>vs.<br>**HONORABLE ERIC K. SHINSEKI, Secretary of Veterans Affairs; SCOTT HUNDAHL, M.D., Severally or, in the alternative, Jointly**<br>Defendants. | Case No.: 2:11-cv-00007-EFB<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: January 16, 2013<br>Hearing Time: 10 a.m.<br>Courtroom: Courtroom 24, 8th Floor<br>501 I Street, Sacramento<br>Judge: Hon. Edmund F. Brennan |

# TABLE OF CONTENTS

**INTRODUCTION** ....................................................................................................1

**STATEMENT OF FACTS**....................................................................................................2

**LEGAL STANDARD FOR SUMMARY JUDGMENT** ..............................................4

**ARGUMENT**....................................................................................................4

**Plaintiff States a Prima Facie Disability Discrimination Claim and has Produced Evidence that Defendant VA's Nondiscriminatory Reasons are False and Pretextual**....................................................................................................4

**Defendant Hundahl Should Not Be Dismissed from the FMLA Claim for the Same Reasons Underlying this Court's Decision in the Prior Motion to Dismiss (Docket No. 41)**....................................................................................................11

**Plaintiff Did Not Violate Federal Rules of Civil Procedure Rule 26, and Plaintiff's Expert Witness is Qualified to Offer an Expert Opinion in this Case.**.......................14

**CONCLUSION** ....................................................................................................15

# TABLE OF AUTHORITIES

**FEDERAL CASES**


*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) .......... 10

*Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340 (Fed. Cir. 2005) .......... 1

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, (1986) 475 U.S. 574 .......... 4

*Touche Ross and Company v. Reddington*, 442 U.S. 560 (1979) .......... 12


**STATUTES**


18 U.S.C. §2510 .......... 13

## INTRODUCTION

Defendants filed a Motion with supporting Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment (hereinafter "Memorandum") on December 14, 2012. (See, Docket No. 42-1). The hearing on this matter has been scheduled for January 16, 2013. Pursuant to Local Rule 230(c), Plaintiff's opposition is timely filed.

In addition, Defendants' Memorandum actually briefs three separate motions. Briefing in support of an actual motion for summary judgment spans only pages 1 through 24 of Defendants' Memorandum. (Docket No. 42-1). On page 24, beginning with the heading "Dr. Hundahl Cannot Be Held Liable," Defendants re-argue their prior motion to dismiss Defendant Hundahl under Plaintiff's FMLA claim. (Docket No. 36). The briefing in support of this motion runs from page 24 to page 42. Finally, in the remaining pages of the Memorandum, Defendants urge the Court to disqualify Plaintiff's expert witness and deny Plaintiff any damages save for a de minimis amount of lost wages.

Plaintiff asserts that Defendants' actions run afoul of fair notice requirements required by Federal Rules of Civil Procedure Rule 7. "The key issue to be resolved is whether the document filed affords notice of the grounds and prayer of the motion to both the court and to the opposing party, providing that party with a meaningful opportunity to respond and the court with enough information to process the motion correctly." *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1347 (Fed. Cir. 2005). Defendants' Notice of Motion and Motion puts all of Defendants' requests under the umbrella of summary judgment. That is improper.

Plaintiff has been harmed by Defendants' actions through having to scramble to respond to three separate motions having only one deadline, especially since one motion—the re-hashed motion to dismiss—has already been briefed and decided and another motion—the motion to disqualify Plaintiff's expert witness and limit his damages—is a discovery dispute ("Plaintiff Cannot Recover Any Damages, Except for Lost Wages for the Two Weeks He was Unemployed After Leaving the VA, Due to His Repeated Violation of Rule 26" Memorandum, Docket No. 42-1, pg. 42). The deadline for a motion to compel discovery has long passed. (See, Status (PreTrial Scheduling) Order, Docket No. 32, pg. 4). Plaintiff respectfully requests the Court to

cure this egregious insufficiency of notice. At the least, the Court should (1) deny Defendants' request to reconsider the motion to dismiss Defendant Hundahl under the FMLA, and (2) deny Defendants' request to disqualify Plaintiff's expert witness and limit Plaintiff's damages.

## STATEMENT OF FACTS

Plaintiff Dr. Matthew Bonzani (hereinafter "Plaintiff") served in the United States Air Force from July 1, 1986 to February 12, 2007. (Plaintiff's Exhibit E, pg. 7). Plaintiff filed a disability claim with Defendant Department of Veterans Affairs (hereinafter "Defendant VA") on July 13, 2007 and received a permanent disability rating of 10% from Defendant VA for his left knee effective February 13, 2007. (*Id.*, pp. 7-8). Plaintiff was hired by Defendant VA on March 18, 2007. (Defendants' Exhibit A, RFA No. 1). Plaintiff was promoted to Chief of Anesthesiology effective November 11, 2007. (Defendants' Exhibit A, RFA No. 3). Plaintiff's employment contract was originally renewed on March 18, 2008 and renewed again on March 18, 2009. (Defendants' Exhibit A, RFA No. 4 and 5).

On April 28, 2009, Plaintiff re-injured his left knee by squatting in an operating room to reach under an operating table for a patient's Foley catheter. (Defendants' Exhibit C at 177:6-10). Plaintiff took leave beginning May 26, 2009, solely for the purpose of surgery on his left knee on June 2, 2009 and recuperation from the surgery. (Defendants' Exhibit H). Plaintiff returned to work on July 13, 2009. (Complaint ¶19).

The very day Plaintiff returned from leave—July 13, 2009—Defendant Dr. Scott Hundahl (hereinafter "Defendant Hundahl") came to Plaintiff's office. (Defendants' Exhibit C at 68:7-9). He cursed and yelled at Plaintiff. (*Id.* at 67:25). Plaintiff recalled Defendant Hundahl saying that a lot of surgeries were canceled while Plaintiff was on leave because there were not enough anesthesiologists. (*Id.* at 69:1-8). Defendant Hundahl testified that when the anesthesia group was short-staffed, Plaintiff's taking of leave compounded the staffing shortage. (Defendants' Exhibit I at 98:19-99:15 and 102:16-25 and 103:1-14). Either way, Defendant Hundahl blamed Plaintiff's taking of leave for the staff shortage in the anesthesiology department. Defendant Hundahl was angry about the staffing shortage and Plaintiff's refusal to apologize for it. (*Id.* at 98:13-18 and 100:17-101:15).

After Plaintiff returned from leave on July 13, 2009, he was assigned more on-call shifts than other members of the anesthesiology department. (Defendants' Exhibit C at 67:3-5; Defendants' Exhibit Q, ¶¶8 and 9). He was told by the anesthesiologist preparing the call schedules, Dr. Edith Bautista, that he was given more call shifts "to make up for the calls I missed while I was sick." (Defendants' Exhibit C at 89:12-90:12). His immediate supervisor, Defendant Hundahl, refused to meet with him on matters pertaining to his duties as Chief of Anesthesiology. (*Id.* at 80:21-81:7). Plaintiff noted that Defendant Hundahl's behavior was markedly different than before he went on protected leave. (*Id.*). Defendant Hundahl also stopped responding to Plaintiff's e-mails or returning Plaintiff's phone calls. (*Id.* at 81:5-82:2). Plaintiff frequently was not relieved for morning break and lunch break while in surgery. (*Id.* at 67:8-18). Plaintiff was also written up as "Absent without Leave (AWOL)" for August 27, 2009, an employment action that was later overturned because Plaintiff was under a court order to appear for mediation on that day. (Defendants' Exhibits K and L).

Plaintiff was informed that his appointment with Defendant VA would not be renewed on January 6, 2010, less than six months after returning from protected leave. (Defendants' Exhibit C at 171:16-172:19; Defendants' Exhibit I at 92:20-23; Defendants' Exhibit O at 76:4-19). Simultaneously with notifying Plaintiff that he would be dismissed, he was given his final written performance evaluation. (Defendants' Exhibit X). Plaintiff's final performance evaluation had him fully successful in four of five categories, and the fifth category was also successful, albeit at the minimal level. (*Id.*).

Upon hearing of Plaintiff's pending dismissal from Defendant VA, Dr. Jon Baker, a thoracic surgeon with 10 years of service at Defendant VA's Sacramento facility, circulated a petition to retain Plaintiff. (Plaintiff's Exhibits A and D). Thirty-one surgeons, nurses, and other medical personnel signed the petition. (Plaintiff's Exhibit A). Three members of the anesthesiology department signed the petition—Dr. David Bell, Dr. Angela Wang, and Dr. Jonathan Rittenbach. (*Id.*). In his petition, as well as a letter to Dr. Brian O'Neill, a letter to Plaintiff, and an e-mail to Defendant Hundahl, Dr. Baker stressed that Defendant VA's Sacramento facility ("Mather") was very short staffed on anesthesiologists and letting Plaintiff

go did not make sense. (Plaintiff's Exhibits A-D).

In fact, Defendant VA's Sacramento facility was short-staffed of anesthesiologists in 2009. In July 2009, a vacancy announcement for a staff anesthesiologist was promulgated and publicized. (Defendants' Exhibit U ¶4). On December 1, 2009, Plaintiff wrote a letter to Defendant Hundahl and sent an e-mail to Dr. William Cahill. (Defendants' Exhibits M and N). In both correspondences, Plaintiff asked to be returned to the position of staff anesthesiologist. (*Id.*). In spite of Plaintiff request, on December 9, 2009, Defendant VA offered the open anesthesiologist position to another candidate. (Defendants' Exhibit U ¶6). That candidate turned Defendant VA down. (*Id.*). Defendant VA made an offer to another candidate on December 23, 2009. That candidate accepted the offer. (Defendants' Exhibit U ¶7).

Plaintiff's employment contract with Defendant VA ended on March 18, 2010, just 8 months after returning from protected leave. (Defendants' Exhibit A, RFA No. 6). With his combined military service and civilian service, Plaintiff has almost 24 years of service to this country of which over 20 years would count toward a Federal Employee Retirement Service ("FERS") pension. However, Plaintiff has only three of the required five years of civilian service to qualify for a FERS pension.

## <u>LEGAL STANDARD</u>

Plaintiff concurs in Defendants' description of the legal standard given in Defendants' Memorandum (Memorandum, Docket No. 42-1, pp. 4-5) as it applies to a motion for summary judgment, as far as it goes. Plaintiff observes that Defendants did omit one very important standard for a summary judgment motion, and that is that all reasonable inferences must be drawn in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Plaintiff does not agree that the legal standard articulated by Defendants necessarily applies to a motion to dismiss or a motion to disqualify an expert witness.

## <u>ARGUMENT</u>

### <u>Plaintiff States a Prima Facie Disability Discrimination Claim and has Produced Evidence that Defendant VA's Nondiscriminatory Reasons are False and Pretextual</u>

Defendants attempt to undermine Plaintiff's Rehabilitation Act claim, first, by denying he

has made the required prima facie showing of discrimination with two arguments: (1) that he is not an individual with a disability and (2) that the conduct he complains of is not an adverse employment action based on disability.

Defendants attempt to deny that Plaintiff is an individual with a disability by separating his pre-existing knee injury from the injury that occurred on-the-job in April 2009. By isolating the injury that occurred on the job, Defendants then argue that such a temporary impairment fails to rise to the level of a disability covered by the Rehabilitation Act. Defendants' argument fails for many reasons.

First, Plaintiff has a permanent disability in his left knee according to Defendant VA. (See, Plaintiff's Exhibit E). Exhibit E is a letter from the Department of Veterans Affairs, Oakland Regional Office, and, thus, is a party admission against interest. The letter states that, as of February 13, 2007, Plaintiff has a 10% disability in his left knee as well as a 10% disability in his right knee. Plaintiff's on-the-job injury involved his left knee. As Plaintiff testified, on April 28, 2009, he re-injured his left knee by squatting in an operating room to reach under an operating table for a patient's Foley catheter. (Defendants' Exhibit C at 177:6-10). There is no break or separation between Plaintiff's prior injury to his knee and his on-the-job injury to his knee. It is the same knee.

In Defendants' Memorandum, Footnote 1, Defendants argue that a VA disability rating does not make a person a disabled individual for purposes of the ADA. (Memorandum, Docket 42-1, pg. 12). The cases cited in that footnote are inapplicable to Plaintiff's case. None of the defendants in the cases cited is the Defendant VA. That makes all the difference. In Plaintiff's case, it was his employer—Defendant VA—that determined that he is an individual with a disability.

Defendants try to claim that Plaintiff has presented no evidence that his knee injury substantially limited any major life activity. In fact, he has. Plaintiff was deposed by opposing counsel on August 15, 2012. (See, Defendants' Exhibit C). In his deposition, Plaintiff testified to the following:

"Q. When you came back to work, did you have any restrictions?

A. Yes.
Q. What were your restrictions?
A. Well, they came down to what I have always not been able to do with that knee. No running…[Plaintiff was interrupted here by opposing counsel]
Q. Well, let me be more specific."

(Defendants' Exhibit C at 75:7-13). Running and squatting are not "essential job functions" of being an anesthesiologist. But as Plaintiff's on-the-job injury shows, a substantial limitation of a major life activity can still impact a person's job even though it is not directly a function of the job.

Defendants then try to construct a phony separation between Plaintiff's knee injury as acknowledged by Defendant VA in February 2007 and his on-the-job injury to the same knee by misrepresenting Plaintiff's testimony. They argue, "…the only "disability" for which plaintiff claims discrimination is his April 2009 workplace knee injury and he has disclaimed any discrimination related to his active duty knee injury." (Memorandum, Docket No. 42-1, pg. 12). Here is what Plaintiff actually testified: "I was discriminated after—I was discriminated because I took time off to get my knee fixed." (Defendants' Exhibit C at 74:9-11). Plaintiff perceived no discrimination before his leave, even though he had a disability, because he wasn't treated differently. It was his need to take leave to have surgery to repair his left knee—a form of accommodation—that triggered the discriminatory conduct.

Plaintiff has produced evidence that his protected leave was a factor in Defendant Hundahl's and his co-workers' hostility. In his recollection of the meeting on or about July 13, 2009, Plaintiff testified that Defendant Hundahl said that a lot of surgeries were canceled while Plaintiff was on leave because there were not enough anesthesiologists. (*Id.* at 69:1-8). In his deposition, Defendant Hundahl explained that when the anesthesia group is short-staffed, Plaintiff's *taking of leave compounds the staffing shortage*. (Defendants' Exhibit I at 98:19-99:15 and 102:16-25 and 103:1-14 [emphasis added]). Defendant Hundahl blamed Plaintiff's leave for the staff shortage in the anesthesiology department and he was angry about it. (*Id.* at 98:13-18 and 100:17-101:15).

Plaintiff's co-workers also used his taking of protected leave to discriminate against him.

After Plaintiff returned from leave on July 13, 2009, he was assigned more on-call shifts than other members of the anesthesiology department. (Defendants' Exhibit C at 67:3-5; Defendants' Exhibit Q, ¶¶8 and 9). He was told by the anesthesiologist preparing the call schedules, Dr. Edith Bautista, that he was given more call shifts "to make up for the calls I missed *while I was sick.*" (Defendants' Exhibit C at 89:12-90:12 [emphasis added]).

Defendants try to minimize the amount of excess on-call shifts that Plaintiff was assigned by adding in the tail end of Plaintiff's employment with Defendant VA—the last two weeks of his employment—when he did not work any call shifts at all. When the amount of on-call shifts are calculated from when Plaintiff returned from leave on July 13, 2009 to when he finished working on-call shifts on February 28, 2010, the difference is stark. Plaintiff worked 53 on-call shifts over that time period versus 40 for Dr. Bell, 37 for Dr. Rittenbach, and 39 for Dr. Wang. (Defendants' Exhibit Q ¶¶8 and 9). And, the time period at issue is short, only 7½ months.

Plaintiff has produced other admissible evidence of discriminatory conduct. His immediate supervisor, Defendant Hundahl, refused to meet with him on matters pertaining to his duties as Chief of Anesthesiology. (Defendants' Exhibit C at 80:21-81:7). Plaintiff noted that Defendant Hundahl's behavior was markedly different than before he went on protected leave. (*Id.*). Defendant Hundahl also stopped responding to Plaintiff's e-mails or returning Plaintiff's phone calls. (*Id.* at 81:5-82:2). Plaintiff frequently was not relieved for morning break and lunch break while in surgery. (*Id.* at 67:8-18). Plaintiff was also written up as "Absent without Leave (AWOL)" for August 27, 2009, an employment action that was later overturned because Plaintiff was under a court order to appear for mediation on that day. (Defendants' Exhibits K and L). Plaintiff was informed that his appointment with Defendant VA would not be renewed on January 6, 2010, less than six months after returning from protected leave. (Defendants' Exhibit C at 171:16-172:19; Defendants' Exhibit I at 92:20-23; Defendants' Exhibit O at 76:4-19).

Defendants assert that Plaintiff cannot state a prima facie disability discrimination claim because none of these examples are of an adverse employment action based on disability. The adverse employment action is, of course, the non-renewal of Plaintiff's employment contract.

The aforementioned instances of discriminatory conduct, in such a short period of time, are a counter-argument to Defendant VA's expected articulation of legitimate, non-discriminatory reasons for termination of Plaintiff's employment contract. In other words, a reasonable trier of fact could find that the Defendant VA's "reasons" are pretext, given other events, articulated by Plaintiff, that were going on during the same time.

For instance, Defendants rely on two letters written by several of the other anesthesiologists to Plaintiff in 2008 to support the point that Plaintiff was failing in his position as Chief of Anesthesiology. (See, Memorandum, Docket 42-1, pg. 14 and Defendants' Separate Statement of Undisputed Facts Nos. 6-14). However, Plaintiff has produced evidence showing that these letters have little to no importance. It is a fact that Plaintiff's employment contract was renewed in March 2009 for one year—six months after the last letter was written. (Defendants' Exhibit A, RFA No. 5). Additionally, three members of the Anesthesiology Department signed a petition in January 2010 to protest the termination of Plaintiff's employment contract—Drs. Bell, Wang, and Rittenbach. (Plaintiff's Exhibit A). Two of those anesthesiologists—Drs. Bell and Wang—were signers on the letters in 2008. It is obvious that the letters of 2008 are not the harsh condemnation of Plaintiff's work performance that Defendants now try to make them out to be.

Defendants make an issue out of Plaintiff's alleged failure to "de-conflict" the leave schedule. The "conflict" occurs when more than one anesthesiologist is out on leave at the same time. Yet, Defendant Hundahl testified that any overlap in leave is just a matter of days, not weeks. (Defendants' Exhibit I at 88:2-10). Further, conflicts in the leave schedule happened periodically anyway. (*Id.* at 87:1-10).

Conflict in the leave schedule was determined to be a problem when Plaintiff was out on leave for his knee. (*Id.* at 87:11-88:1). The question is, why did this become a problem when Plaintiff was out on leave? The leave calendar is publicly posted in Plaintiff's office. (*Id.* at 88:11-25). It is up to the individual anesthesiologists to enter their leave on the calendar themselves. (*Id.*). In addition, the request for leave has to be entered into VISTA, Defendant VA's computer system, by the employee. (*Id.*). In other words, anyone could review the leave calendar at any time, including Defendant Hundahl.

Plaintiff has also produced evidence that the non-renewal of his term-limited appointment because of Defendants' stated reasons is suspect. As an initial matter, Defendants object to Plaintiff's assertion that renewal of term-limited appointments is automatic. It is true that there is no computer program that renews an employment contract unless programmed otherwise. That is not what Plaintiff meant by "automatic." Rather, Plaintiff used the word "automatic" in layperson's terms, meaning something that happens usually as a matter of course, without much thought or effort. To that end, Plaintiff served Requests for Admissions (Plaintiff's Exhibit F) specifically asking about the renewal of other anesthesiologists term-limited appointments. As expected, except for an anesthesiologist that quit and another that was hired by Defendant VA outright, all of the other anesthesiologists had multiple renewals of their term-limited appointments.

In addition, Plaintiff's performance reviews were successful. At least, that is how he was consistently rated, even up to his final performance review which was given to him at the same time as the notice that his employment would be terminated. On his final performance review, Plaintiff received a "fully successful" rating on four out of five categories. (Defendants' Exhibit X). He received a "minimally successful" rating on the fifth category. (*Id.*).

Plaintiff was also recognized as a top-notch anesthesiologist and was well-like by his co-workers. When word of his pending termination got out, a petition was circulated and 31 co-workers signed it, including three anesthesiologists. (Plaintiff's Exhibit A). A surgeon, Dr. Jon Baker, even went so far as to petition Defendant Hundahl and Dr. Brian O'Neill, via an e-mail and a letter, to re-think the decision to terminate Plaintiff's employment. (Plaintiff's Exhibits B and D).

Defendant VA's reasons for not letting Plaintiff remain as a staff anesthesiologist are suspect as well. Defendant VA claims that it was already in the middle of a search and recruitment effort to fill the open staff anesthesiologist position. Plaintiff notified both Defendant Hundahl and Dr. Cahill that he wished to remain as a staff anesthesiologist on December 1, 2009. (Defendants' Exhibit M and N). Defendant VA made an offer to a candidate for the open staff anesthesiologist position on December 9, 2009. (Defendants' Exhibit U ¶6).

That candidate turned the offer down. (*Id.* ¶7). An offer was made to another candidate on December 23, 2009 and that offer was accepted. (*Id.*). Defendant VA ignored Plaintiff's desire to serve as a staff anesthesiologist, insisting instead on taking another three weeks to eventually fill the open position.

Defendants also try to argue that they should be entitled to the "same actor inference" defense. They state that Defendant Hundahl was "responsible for recommending" Plaintiff's hiring, promotion, contract renewals, and firing. (Memorandum, Docket No. 42-1, pg. 18). Defendants are guilty of trying to have something both ways. For purposes of the "same actor inference" defense, Defendant Hundahl is portrayed as the responsible party, the decision-maker. For purposes of a "qualified immunity" defense, Defendant Hundahl does not possess the "requisite control over plaintiff's work situation." (*Id.*, pg. 39). Is Defendant Hundahl a decision-maker or is he not? Does his power and control rise to the level necessary for the "same actor inference" or not? Plaintiff's co-workers believe that Defendant Hundahl has significant power and control over their employment. (See, Plaintiff's Exhibits B and C).

Plaintiff argues that Defendant Hundahl is a decision-maker which would make him eligible for the "same actor inference." Of course, in this case, that defense would not apply because Plaintiff's protected leave occurred after his hiring, promotions, renewals but before his non-renewal, and Defendant Hundahl has testified, of his own free will, that Plaintiff's leave was a factor in his anger over the staffing shortage. (Defendants' Exhibit I at 98:19-99:15 and 102:16-25 and 103:1-14).

Plaintiff presents enough evidence to support a hostile work environment claim. Defendants cite to *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) for the description of a hostile work environment, conduct that is so extreme as to amount to a change in the terms and conditions of employment. Being scheduled for more on-call shifts is a change in the terms and conditions of employment because it is extra work. A refusal to meet with Plaintiff and ignoring Plaintiff's e-mails and phone calls is a change in the terms and conditions of employment because it prevents him from doing his job. Allowing Plaintiff's contract to expire is extreme conduct when Defendant VA is short-staffed, as it was in 2009, and Defendant

Hundahl complains that it is short-staffed. (Defendants' Exhibit I at 98:19-99:15; 102:16-25; 103:1-14 and Defendants' Exhibit U). All of this conduct occurred in such a short period of time, less than six months elapsed between when Plaintiff returned from his protected leave and when he was notified that his employment contract would not be renewed. All of this admissible evidence supports a claim of hostile work environment.

Nor should summary judgment be granted on Plaintiff's FMLA claim. The FMLA statute exists to provide a right to a certain amount of leave for specific personal or family reasons. It is Plaintiff's disability, and his need for leave for medical treatment of the disability, that are at the core of this case. All of the arguments that Plaintiff has put forward on adverse employment actions and evidence of pretext apply to this claim as well.

Plaintiff would like to clear up one point. Defendants misstate case law under the FMLA. Defendants state that "plaintiff has disavowed any claim that the foregoing conduct occurred because he took too much leave—precisely what he must prove to establish a violation of the FMLA." (Memorandum, Docket No. 42-1, pg. 22). "Too much leave" is not the standard for an FMLA violation. Theoretically, being punished for taking just one day of leave is actionable if that leave is protected by the FMLA.

In summary, Plaintiff is a disabled individual under the Rehabilitation Act. He took leave to receive medical treatment for his disability, and when he returned to work, Defendants subjected him to a hostile work environment and terminated his employment just months later. Plaintiff has produced admissible evidence of his hostile work environment and of Defendants illegal motivations leading to his termination, thus showing pretext. Defendants' request for summary judgment should be denied.

**Defendant Hundahl Should Not Be Dismissed from the FMLA Claim for the Same Reasons Underlying this Court's Decision in the Prior Motion to Dismiss (Docket No. 41).**

Plaintiff reiterates his belief that Defendants violate Federal Rules of Civil Procedure Rule 7. In actuality, this is a motion for reconsideration as Defendant Hundahl's liability under the FMLA has already been contested and decided. Accordingly, both Plaintiff's prior filing of opposition to Defendants' Motion to Dismiss (Docket No. 38) and the Court's Order (Docket

No. 41) are incorporated herein.

Regarding Defendants' argument that Defendant Hundahl lacks sufficient power and control to be an "employer" under the FMLA, this is contrary to Defendants' argument that Defendant Hundahl has sufficient power and control to use the "same actor inference." As discussed previously, Plaintiff's co-workers perceive Defendant Hundahl as having sufficient power and control. This Court should not be deceived by arguments that Defendant Hundahl's supervisor and/or some committee reviews his decisions and concurs. The original employment decision originates with Defendant Hundahl and there is no evidence otherwise.

Defendants construct a multi-tiered, reasoned argument supporting their assertion that "Federal Supervisors Cannot be Held Individually Liable Under the FMLA." (Memorandum, Docket No. 42-1, pp. 27-37). Supreme Court jurisprudence disfavors federal supervisor liability. (*Id.* at pp. 29-32). Congress disfavors federal supervisor liability. (*Id.* at pp. 33-34). Statutory ambiguity cannot overcome the presumption against federal supervisor liability. (*Id.* at pp. 34-37). Unfortunately, an argument is only as good as the foundation upon which it is built, and several parts of Defendants' argument are deficient.

First, the *Touche Ross/Alexander* cases that Defendants cite relate to implied private causes of action which is total inapplicable in this instance because there is nothing implied about the private right of action contained in the FMLA. In *Touche Ross and Company v. Reddington*, 442 U.S. 560 (1979), securities investors argued that a private right of action was implicit in the Securities Exchange Act of 1934. The Supreme Court said the analysis of whether Congress intended a private cause of action would apply a "stricter standard" that would focus primarily, if not exclusively, on statutory text. The FMLA, in its text, allows suit against public agencies and supervisors so apparently the FMLA meets the *Touche Ross* standard. Defendants attempt to leap from disfavor of implied private rights of action to dissuading this Court from resolving statutory ambiguity because it allegedly might "discern and define" new causes of action.

The *Bivens/Wilkie* cases that Defendants discuss similarly pertain to implied private causes of action for constitutional violations which is additionally inapplicable because the

FMLA is a statute. That waivers of federal sovereign immunity must be narrowly construed is a given but even Defendants admit that the federal government has waived sovereign immunity under the FMLA. (*Id.* at pg. 36).

Defendants request the Court to consider the burdens of litigation and the staggering financial liability on supervisors, and the negative impact that will have on the civil service. (*Id.* at pp. 36-37). Yet, Defendants had previously discussed the Federal Wiretap Act, 18 U.S.C. §2510, under which Congress exposed federal supervisors to financial liability. (*Id.* at pg. 33). Defendants never explain why this Court should be mindful of the burdens of litigation and the staggering financial liability when Congress is not. After all, it was Congress that authorized causes of action under the FMLA for public agencies and persons acting for their employer.

Finally, Defendants argue that Defendant Hundahl should be entitled to a qualified immunity defense. (*Id.*, at pp. 37-42). They argue that what constitutes FMLA interference is not clearly established and whether supervisors are subject to individual liability is not settled. (*Id.*). They argue that qualified immunity is necessary to give government officials room to make reasonable, if mistaken, judgments.

The legal standard for qualified immunity is that the right afforded by the statute has to be clearly established and settled, not the issue of whether liability attaches. To see it any other way creates a ridiculous situation of a federal supervisor who knows of a clearly established right but violates it anyway thus subjecting his employer, the federal government and ultimately the taxpayer, to enormous liability.

Defendants' *Scherer* citation is inapplicable because Defendant Hundahl was not acting swiftly. (*Id.*, at pg. 42). Defendants constantly contend that Defendant Hundahl's "decisions" went to others for review and approval, thus none of them were spur of the moment judgments. In fact, that is also the flaw in Defendants' argument that qualified immunity is necessary to allow for reasonable, if mistaken, judgments. Defendants have previously asserted that Defendant Hundahl confers with Defendant VA's Human Resources department when making his "recommendations." (See, Defendants' Exhibit II, ¶5). If so, how could Defendant Hundahl ever make a mistake of law?

In summary, Defendant Hundahl is a proper defendant under the FMLA. He is a decision-maker, regardless of Defendants' characterizations otherwise, but he has a wealth of resources to draw from in his work environment to insure that mistakes are never made. Nor does Defendant Hundahl make speedy employment decisions. Even his employee performance evaluations are often late. (Defendants' Exhibit C at 46:20-21). This Court's previous decision was correct. It should not reconsider its decision now.

**<u>Plaintiff Did Not Violate Federal Rules of Civil Procedure Rule 26, and Plaintiff's Expert Witness is Qualified to Offer an Expert Opinion in this Case</u>**

Plaintiff reiterates his belief that Defendants violate Federal Rules of Civil Procedure Rule 7 with inclusion of these issues in their motion for summary judgment.

Beginning on page 42 of Defendants' Memorandum, Defendants assert that Plaintiff, through his counsel, repeatedly violated Federal Rules of Civil Procedure Rule 26, specifically the requirement for disclosure of damages. (Memorandum, Docket No. 42-1, pg. 42). Citing numerous cases and then detailing an exhaustive chronology of disclosures and assorted requests, Defendants try to portray as an abuse what is actually a normal development of facts and evidence.

Beginning with Plaintiff's initial disclosures, served on Defendants on December 15, 2011, Plaintiff has always been up front that the loss of a Federal Employee Retirement System (hereinafter "FERS") pension is a major component of his damages. (Defendants' Exhibit Y). To reinforce the point, on February 3, 2012, Plaintiff served his responses to Defendants' Request for Production of Documents, Set I. In response to Request No. 6, Plaintiff stated, "In addition, Plaintiff's damages are approximately one month of lost wages and the loss of his federal pension." (Defendants' Exhibit DD, RFP No. 6).

Defendants assert that they were entitled to an estimate of damages in addition to the description of the damages provided. The problem is that Plaintiff is not an accountant, much less a forensic accountant. The value of a lost pension is a present dollar amount representing a future income stream with interim cost-of-living adjustments and investment rates affecting the outcome. Defendants have to know that such a calculation is beyond Plaintiff's ability and that

Plaintiff would require the assistance of an expert to distill all of those variables into a single estimate.

In addition, Defendants knew that Plaintiff would assert damages for a lost pension since December 2011. Therefore, Defendants were entirely capable of calculating the financial damage of a lost FERS pension themselves (with aid, of course). All of the data required is in Defendant VA's possession—Plaintiff's past wages, Plaintiff's future wages working an additional two years for Defendant VA (the amount of time needed for Plaintiff to vest in a FERS pension), FERS cost-of-living adjustments, Plaintiff's age, the buy-in required to attach Plaintiff's military service time. Defendants did designate a forensic accountant as an expert witness. (Defendants' Exhibits JJ and NN). Defendants' expert witness produced a report on September 28, 2012 as well as a rebuttal report on October 19, 2012. (*Id.*). He had possession of all of the documents that Plaintiff's expert witness did, yet not once did he calculate (or even attempt to calculate) an estimate of Plaintiff's damages from a lost FERS pension. Defendants' strategy from the start has been to deny Plaintiff any damages, even in the case that Plaintiff prevails.

Defendants then try to disqualify Plaintiff's expert witness. First, they say that Plaintiff's expert, Conrad Davis, is unqualified for a variety of reasons. A review of Mr. Davis' expert report and CV dispels that argument completely. (Plaintiff's Exhibit G, and Defendants' Exhibits EE and MM).

Next, Defendants take issue with certain figures Mr. Davis used (such as the salary growth rate) and assumptions he made, arguing that makes his estimate of damages unreliable to the point that he should be disqualified. But, that argument does not disqualify him as an expert. That argument is more properly the subject of competing expert witnesses, and as noted previously, Defendants' expert has purposefully not estimated Plaintiff's damages from a lost FERS pension.

In summary, Defendants cannot show any harm to themselves from Plaintiff's actions in his disclosure of his expert witness and the estimate of the damages from a lost FERS pension.

## CONCLUSION

On December 14, 2012, Defendants filed a Motion for Summary Judgment that Plaintiff contends is actually three motions in one. Plaintiff believes that he has been harmed by the inclusion of issues that are not properly the subject of a summary judgment motion because time is finite and the time spent on responding to the non-summary judgment motions is time not spent on arguing his position on summary judgment issues.

Still, Plaintiff has produced enough evidence for this case to proceed to trial. He has shown that he is a disabled individual, deemed to be so by his employer Defendant VA. He exacerbated his disability at work, and took leave to have surgery. Upon his return from leave, he encountered hostility from both Defendant Hundahl and other anesthesiologists, and he has produced evidence that his leave was a factor in their hostility. His term-limited appointment was not renewed a few months later, in spite of successful performance reviews, the support of his co-workers, a practice by Defendants of almost always renewing appointments, and a staffing shortage at Defendant VA. Plaintiff respectfully requests that the Court deny Defendants' motion in its entirety.

Respectfully submitted,

Dated: January 2, 2013    LAW FIRM OF JOANNE DELONG

By: /s/ Joanne DeLong
Joanne DeLong
Attorney for Plaintiff Dr. Matthew Bonzani