Joanne DeLong, CA SB #237161
2520 S Street #5
Sacramento, CA 95816
Phone: (916) 452-3410
E-mail: jrdelong@comcast.net

Attorney for Plaintiff Dr. Matthew Bonzani

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**MATTHEW BONZANI, M.D.**

Plaintiff,

vs.

**HONORABLE ERIC K. SHINSEKI, Secretary of Veterans Affairs; SCOTT HUNDAHL, M.D., Severally or, in the alternative, Jointly**

Defendants.

Case No.: 2:11-cv-00007-EFB

**PLAINTIFF'S RESPONSE TO DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED FACTS**

Hearing Date: January 16, 2013
Time: 10 a.m.
Place: Courtroom 24, 8th Floor
501 I Street, Sacramento
Judge: Hon. Edmund F. Brennan

| Defendants' Undisputed Fact | Plaintiff's Response |
|---|---|
| 1. Plaintiff was hired as a staff anesthesiologist at the Sacramento VA Medical Center on March 18, 2007. | Undisputed. |
| 2. Plaintiff initially was appointed for a one-year term not to exceed ("NTE") March 18, 2008. | Undisputed. |
| 3. Plaintiff's temporary appointment was renewed for a one-year term not to exceed ("NTE") March 18, 2009. | Undisputed. |
| 4. Plaintiff's temporary appointment was renewed for another one-year term not to exceed ("NTE") March 18, 2010. | Undisputed. |
| 5. Plaintiff was promoted to the position | Undisputed. |

| | |
|---|---|
| of Chief of Anesthesiology effective November 11, 2007. | |
| 6. On April 24, 2008, the staff anesthesiologists wrote a letter to plaintiff expressing various feedback and concerns they had about the Anesthesiology Service. | Undisputed. |
| 7. In the April 24, 2008 letter, the staff anesthesiologists asked that plaintiff immediately pursue proposals for new internist/anesthesia technician and nurse anesthetist positions, and they complained that the call schedules were not being made well enough in advance; that there should be an agenda for the weekly Anesthesia Service meetings; that an interim chief should be assigned whenever plaintiff was going to be absent; that the scheduling of daily operating room cases should be more realistic; that there were problems with the daily staffing calendar; and that there should be a more formal assignment process to assure fairness in the daily call schedule, including designation of a late person to provide backup for the person on call. | Disputed. The letter speaks for itself. According to the letter (Defendants' Exhibit B) these aren't complaints, they are "suggestions." For instance, there is no statement that the "call schedules were not being made well enough in advance." The suggestion was for "Call schedules made well in advance." |
| 8. In the April 24, 2008 letter, the staff anesthesiologists stated that "a group is only as strong as its leader," which plaintiff interpreted to mean that the group did not believe he was a strong leader. | Disputed. This statement is incomplete. The entire statement reads "a group is only as strong as its leader *and vice versa*." Further, in Plaintiff's deposition, it is defense counsel that suggests that the group did not believe he was a strong leader which Plaintiff disagreed with. (Defendant's Exhibit C at 134:7-13). |
| 9. In the April 24, 2008 letter, the staff anesthesiologists noted that plaintiff had "a number of personal stressors, including the potential of relocating to Chicago, family issues, and medical problems," referring to plaintiff's child custody disagreements with his ex-wife and to various unspecified medical problems. | Disputed. Again, this statement is incomplete. The letter goes on to state that the group hoped Plaintiff felt their "support during these difficult times." (Defendant's Exhibit B). |
| 10. On September 10, 2008, four of the same staff anesthesiologists who signed the April 24, 2008 letter signed another letter to plaintiff which was critical of his performance as Chief. | Undisputed. Two of the staff anesthesiologists who signed this letter—Dr. Angela Wang and Dr. David Bell—signed a petition in January 2010 to retain Plaintiff (Plaintiff's Exhibit A). |
| 11. In the September 10, 2008 letter, the staff anesthesiologists complained that plaintiff | Undisputed. Two of the staff anesthesiologists who signed this letter—Dr. Angela Wang and |

| | |
|---|---|
| had not made a strong effort to pursue the new positions and that he had not discussed the positions with the Chief of Staff; that the staffing and call schedules still were not being made well in advance; that plaintiff did not designate a late person to back up the person on call as they had suggested; that plaintiff did not provide enough information to Dr. Wang, who was acting as interim chief when plaintiff was absent, to allow her to function as interim chief; that there continued to be an overall lack of attention to details in the daily operating room schedule and that plaintiff was not enforcing certain rules; and that they did not believe plaintiff was sufficiently communicating with surgical colleagues. | Dr. David Bell—signed a petition in January 2010 to retain Plaintiff (Plaintiff's Exhibit A). |
| 12. The staff anesthesiologists stated in the September 10, 2008 letter that they sensed that plaintiff had "distanced [himself] from [his] chief responsibility, and noted that plaintiff had said that his position was "not worth it and not as [he] expected." | Undisputed. Two of the staff anesthesiologists who signed this letter—Dr. Angela Wang and Dr. David Bell—signed a petition in January 2010 to retain Plaintiff (Plaintiff's Exhibit A). |
| 13. The staff anesthesiologists stated in the September 10, 2008 letter that "[p]erhaps this is not an ideal stage in your career to shoulder these responsibilities." | Undisputed. Two of the staff anesthesiologists who signed this letter—Dr. Angela Wang and Dr. David Bell—signed a petition in January 2010 to retain Plaintiff (Plaintiff's Exhibit A). |
| 14. Plaintiff recognized that the other anesthesiologists thought he should not be chief. | Disputed. Specifically, Plaintiff recognized that the other anesthesiologists saw that he had a lot of responsibilities. Defendant did not provide complete documentation for this citation (pg. 153 of Defendants' Exhibit C is missing). |
| 15. Plaintiff signed a Declaration of Health stating that he did not have a physical or mental health condition that would adversely affect his ability to perform his job in January 2007. | Undisputed. |
| 16. Plaintiff signed another Declaration of Health in January 2009 stating that he did not have a physical or mental health condition that would adversely affect his ability to perform his job. | Undisputed. |
| 17. Plaintiff did not seek any accommodations from the VA for his active duty knee injury. | Undisputed. |
| 18. On April 28, 2009, while working in an | Disputed. The citation Defendant refers to |

| | |
|---|---|
| operating room, plaintiff injured his left knee while reaching under the operating room table to pick up a patient's Foley catheter. | specifically states that Plaintiff "squatted down in the operating room" and then reached under the operating room table. (Defendant's Exhibit C at 177:6-10 and 178:23-179:2) |
| 19. Plaintiff applied for workers' compensation benefits and requested continuation of his regular pay. | Undisputed. |
| 20. His workers' compensation claim was approved, he went out on leave on May 26, and he had knee surgery on June 2, 2009. | Undisputed. |
| 21. Plaintiff returned to work on July 13, 2009. | Undisputed. |
| 22. When plaintiff returned to work, he could perform all of the essential functions of his job, without restrictions. | Undisputed. |
| 23. Plaintiff's workers' compensation leave was approved by the VA and plaintiff received his full pay for the entire time he was out on workers' compensation leave. | Undisputed. |
| 24. An important duty of Chief of Anesthesiology is to "de-conflict" the leave calendar to ensure that no more than one anesthesiologist is scheduled to be on leave at the same time. | Disputed. Defendants have produced no documentation describing the duties of a Chief of Anesthesiology. |
| 25. While plaintiff was on leave for his knee surgery, Dr. Hundahl and others discovered significant problems in the operations of the anesthesia group, including that plaintiff had not de-conflicted the leave schedule. | Undisputed. |
| 26. When two anesthesiologists had scheduled to be on vacation at the same time, leaving the anesthesia group short-staffed, plaintiff's absence meant that anesthesia was down three anesthesiologists, compounding the staffing shortage. | Undisputed. This is a party admission against interest that Plaintiff's leave—taken because of his disability and protected by the FMLA—was perceived to be a problem and a factor in the staffing shortage. |
| 27. As a result, surgeries had to be cancelled, and rescheduled, because there were not enough outside fee-basis providers to fill the gaps. | Undisputed. |
| 28. When plaintiff returned from leave, Dr. Hundahl met with him to discuss problems in the operation of the anesthesia group, including the problems caused by plaintiff's failure to de-conflict the leave schedule. | Disputed. Defendants have produced no documentation describing the duties of a Chief of Anesthesiology. |
| 29. On August 21, 2009, plaintiff was | Undisputed. |

| | |
|---|---|
| present at an anesthesia group meeting where one of the topics discussed was Surgical Service leave-request policies, including the requirement that leave be scheduled 30 days in advance. | |
| 30. On September 3, 2009, Dr. Hundahl gave plaintiff a written counseling for being absent without leave (AWOL) on August 26 and 27, 2009 in violation of the leave policies. | Undisputed. |
| 31. In the written counseling, Dr. Hundahl told plaintiff that, because of his status as Chief, he was expected to maintain the highest standards of professional and personal conduct and set an example and follow orders and procedures. | Undisputed. |
| 32. He notified plaintiff that failure on his part to correct such unacceptable behavior may result in early termination of his temporary appointment. | Undisputed. |
| 33. Subsequently, the August 27 AWOL was rescinded because plaintiff provided proof that he had a court-ordered mediation. | Undisputed. |
| 34. The August 26 AWOL was upheld because plaintiff had not obtained approval to take leave that day, did not report for duty, and did not call Dr. Hundahl or anyone else to notify them that he would be absent. | Undisputed. |
| 35. Plaintiff did not appeal or grieve the merits of the final AWOL determinations. | Disputed. Plaintiff contested both AWOLs. That is why the August 27, 2009 AWOL was overturned. |
| 36. On December 1, 2009, plaintiff notified Dr. Hundahl that he was resigning from his position as Chief of Anesthesiology effective January 1, 2010 and that he wanted to serve the VA as a staff anesthesiologist. | Undisputed. |
| 37. On December 1, 2009, plaintiff notified Chief of Staff, Dr. William Cahill, that he was resigning from his position as Chief of Anesthesiology effective January 1, 2010 and that he wanted to serve the VA as a staff anesthesiologist. | Undisputed. |
| 38. At a meeting attended by plaintiff, Dr. Hundahl, and Surgical Service Administrative Officer Carol Ross on January 6, 2010, Dr. Hundahl read a memorandum to plaintiff which acknowledged receipt of plaintiff's | Undisputed. |

| | |
|---|---|
| resignation letter, acquiesced in his request to serve as a staff anesthesiologist for the remainder of his temporary appointment, and informed plaintiff that his appointment with the VA would not be renewed. | |
| 39. Plaintiff's appointment expired on its own terms on March 18, 2010. | Undisputed. |
| 40. The sole basis of plaintiff's disability discrimination claim is his workplace knee injury that occurred in April 2009. He is not claiming discrimination related to his active duty knee injury. | Disputed. Specifically, Plaintiff stated, "I was discriminated because I took time off to get my knee fixed." His knee was re-injured in April 2009. It is the same knee. (Defendants' Exhibit C at 74:3-14 and 75:7-12). |
| 41. Plaintiff testified that, after he returned from workers' compensation leave in July 2009, Dr. Hundahl confronted him in his office and told him "Everything went to shit while you were gone." | Undisputed. |
| 42. Plaintiff took Dr. Hundahl's statement at the July 2009 meeting to mean that "he didn't like the way things ran on a day-to-day basis" while plaintiff was on leave because "he said there were a lot of cases that were canceled" because "we were short of anesthesiologists." | Undisputed. |
| 43. Plaintiff states that at the July 2009 meeting Hundahl also told plaintiff that the anesthesia group's reputation was "shit because they were lazy." | Undisputed. |
| 44. Dr. Hundahl's use of profanity at the July 2009 meeting was not directed to plaintiff and Dr. Hundahl instead was referring to the operation and the reputation of the anesthesia group as a whole. | Disputed. Plaintiff never confirmed opposing counsel's suggestion that Defendant Hundahl's use of profanity was not directed at Plaintiff. (Defendants' Exhibit C at 73:14-20). |
| 45. Plaintiff alleges that Dr. Hundahl yelled and cursed at him at a meeting in September 2009 where Dr. Hundahl told plaintiff that he had been determined to be AWOL for missing two days of work without following proper procedures. | Undisputed. |
| 46. Dr. Hundahl told plaintiff at the September 2009 meeting that plaintiff "did not follow the correct procedure for missing work those days; that he was writing [plaintiff] up for being AWOL; that we were trying to run a [expletive] block system here, and we couldn't have [expletive] anesthesiologists taking off | Undisputed. |

| | |
|---|---|
| whenever they pleased.” | |
| 47. Any “general cursing in the operating room,” by Dr. Hundahl was not directed specifically at plaintiff. | Undisputed. |
| 48. Plaintiff has identified only one email to which Dr. Hundahl did not respond, and he could only give an estimate about the date it was sent. | Disputed. Opposing counsel only asked for one specific example before switching the subject. (Defendants’ Exhibit C at 81:14-82:2). |
| 49. When asked if he had emails that he sent to Dr. Hundahl which were not responded to, plaintiff said “I’d have to look through my emails again” and “[w]hether I have copies of them now, I do not know.” | Undisputed. |
| 50. Plaintiff only identified a single specific instance when Dr. Hundahl would not meet with him. One day after an anesthesia department meeting, he went to Dr. Hundahl’s office and asked the secretary if Dr. Hundahl was available because he wanted to speak with Dr. Hundahl about the anesthesia department meeting. | Disputed. Plaintiff described one specific episode when Defendant Hundahl would not meet with him after which opposing counsel asked for a break. After the break, opposing counsel opened a different line of questioning. (Defendants’ Exhibit C at 76:22-79:16). |
| 51. Although Dr. Hundahl was in his office, he told plaintiff that they “would have to speak at another time.” | Undisputed. |
| 52. Plaintiff claimed that this was discrimination because “it happened multiple times and it was not his normal behavior pattern before my knee injury” and that Dr. Hundahl “had an open-door policy prior to my injury.” | Undisputed. |
| 53. Even before plaintiff went on leave for his workplace knee injury, there were times when he would stop in to see Dr. Hundahl and Dr. Hundahl was not available to talk with him. | Disputed. Plaintiff actually said “not commonly” when describing times that Defendant Hundahl was in his office but not available to speak with Plaintiff *before Plaintiff’s leave*. (Defendants’ Exhibit C at 79:17-20). |
| 54. There were times after plaintiff came back from leave that Dr. Hundahl actually did meet with him, and plaintiff is not claiming that Dr. Hundahl never met with him after he returned. | Undisputed. |
| 55. Regarding the allegation that he received extra on-call shifts, it was plaintiff’s own subordinates – not Dr. Hundahl – who assigned the on-call shifts, including staff anesthesiologist Dr. Edith Bautista. | Undisputed. |

| | |
|---|---|
| 56. The reason plaintiff's subordinates gave him more on-call shifts was because the group needed him to "make up for the calls [he] missed" while he was on leave. | Undisputed. |
| 57. Plaintiff also claims that he was discriminated against because his subordinates scheduled him for more complicated surgeries and did not give him breaks. | Undisputed. |
| 58. Plaintiff did not keep any records showing when he was denied breaks. | Undisputed. |
| 59. Plaintiff tried to resolve the issue on-call, complicated surgery, and breaks issues "at the lowest possible level" which "was not to make that much of an issue of it, to try to get the group to function better." | Disputed. Plaintiff did not testify that he tried to resolve the issues of receiving more complicated surgeries and not being relieved for breaks "at the lowest possible level." (Defendants' Exhibit C at 90:1-9). |
| 60. As Chief, plaintiff had the authority to step in and take control of the on-call schedule, but he decided not to do so. | Disputed. (Defendants' Exhibit C at 89:12-14 and 121:16-21). |
| 61. In four out of the nine months during this period, at least one of the other anesthesiologists had more on-calls than plaintiff. | Undisputed. |
| 62. A comparison of total on-calls on a doctor-by-doctor basis for this period shows that, on average over the nine-month period, plaintiff had one to one-and-a-half more on-call days per month than the other doctors. | Disputed. These totals are not calculated correctly. Since Plaintiff was not on-call at all during his last two weeks, March 1-18, 2010 should not be counted. Leaving off March 1-18, 2010 figures, the totals are Plaintiff—53; Dr. Bell—40; Dr. Rittenbach—37; Dr. Wang—39. (Defendants' Exhibit Q ¶¶8 and 9) |
| 63. Regarding the hiring panel for the open staff anesthesiologist position, Dr. Hundahl "would not have any of us present to interview the new candidate" for the open position. | Undisputed. |
| 64. Plaintiff's complaint about being excluded from the hiring panel was "[n]ot necessarily that [it] didn't include me," it was "that [it] didn't include a member of our anesthesia group." | Undisputed. |
| 65. Plaintiff alleges that that Dr. Hundahl said that he was not going to renew plaintiff's appointment because plaintiff "missed too much work with [his] new injury and because [he] took too much sick leave." | Undisputed. Although Plaintiff did more than "allege" this fact. He testified under oath as to Defendant Hundahl's exact words. (Defendants' Exhibit C at 172:3-7). |
| 66. Plaintiff claimed in discovery that his active duty knee injury impacted the major life activities of running and squatting. | Undisputed. |

| | |
|---|---|
| 67. Anesthesiology on-call schedules were not completed in a timely manner. | Disputed. When pressed, the deponent, Carol Ross, equivocated between saying the schedules were consistently untimely with the schedules were frequently untimely. (Defendants' Exhibit O at 33:8-13 and 34:9). |
| 68. The Chief of Staff knew of Dr. Hundahl's concerns about plaintiff and, after meeting with Dr. Hundahl and Human Resources, the Chief of Staff concurred in Dr. Hundahl's recommendation to let plaintiff's temporary appointment expire. | Undisputed. |
| 69. At the Director's request, the Chief of Staff looked into non-renewal to clarify issues and concerns, and confirmed that there were legitimate reasons not to renew plaintiff's temporary appointment, and that he still concurred in Dr. Hundahl's recommendation to let the appointment expire. | Disputed. Plaintiff disputes that the reasons were legitimate. |
| 70. After receiving notice on January 6, 2010 that his resignation was accepted and that his temporary appointment would not be renewed, plaintiff asked Dr. Hundahl if he could have the open staff position. | Disputed. This mischaracterizes Plaintiff's testimony. Plaintiff testified that he asked Defendant Hundahl why he "couldn't just keep being a staff anesthesiologist" (when told he would be terminated), not whether he could have the open position. (Defendants' Exhibit C at 169:25-170:3). |
| 71. The staff and chief anesthesiologist positions are separate full-time positions, staff is a "Tier 1" position, while chief is a "Tier 2" position, and the staff and chief positions receive different pay. | Undisputed. |
| 72. The open staff anesthesiologist position had been announced in July 2009, and in November and December 2009 the selection process was in its final stages. | Disputed. There is no evidence in the cited materials that the "selection process was in its final stages." Defendants are also missing pg. 124 of Exhibit I. |
| 73. The hiring committee interviewed multiple candidates in October and November. | Undisputed. |
| 74. The candidate that was selected to be hired had interviewed with the hiring committee on November 4, and an offer letter was sent to the candidate on December 9, 2009. | Undisputed. |
| 75. The candidate declined the position on December 22, 2009 and, on December 23, 2009, an offer was made to another candidate, who accepted the staff position that same day. | Undisputed. |
| 76. Dr. Hundahl recommended that | Disputed. Defendant Hundahl's supervisors |

| | |
|---|---|
| plaintiff be hired as staff anesthesiologist in 2007, but the final decision was made by the Director and Human Resources. | and HR may review his decision and concur with it but the initial decision is his. (Defendants' Exhibit I at 91:22). In addition, other personnel perceive Defendant Hundahl as the person with the ability to hire and fire. (See, Exhibits B and C). |
| 77. Dr. Hundahl recommended that plaintiff be promoted to chief, but the decision was made by the Chief of Staff, the Director, the Professional Standards Board, and the Compensation Panel, and Human Resources. | Disputed. Defendant Hundahl's supervisors and HR may review his decision and concur with it but the initial decision is his. (Defendants' Exhibit I at 91:22). In addition, other personnel perceive Defendant Hundahl as the person with the ability to hire and fire. (See, Exhibits B and C). |
| 78. Dr. Hundahl recommended that plaintiff's appointment be renewed twice. | Disputed. Defendant Hundahl's supervisors and HR may review his decision and concur with it but the initial decision is his. (Defendants' Exhibit I at 91:22). In addition, other personnel perceive Defendant Hundahl as the person with the ability to hire and fire. (See, Exhibits B and C). |
| 79. Dr. Hundahl recommended that plaintiff's appointment not be renewed beyond March 18, 2010. | Disputed. In Defendant Hundahl's own words, "I decided not to renew his appointment." (Defendants' Exhibit I at 91:22) |
| 80. Plaintiff did not state at deposition that he was downgraded in his performance evaluation because he took leave. | Undisputed. |
| 81. Instead, plaintiff's complaint about the performance review was it was "late" because he did not receive it until January 2010, and it was delivered concurrently with being told that his temporary appointment would not be renewed. | Undisputed. |
| 82. Evaluations are sometimes late and plaintiff does not know if any other evaluations were late. | Undisputed. |
| 83. Evaluations written by Dr. Hundahl were commonly late. | Undisputed. |
| 84. Plaintiff's explanation for why receiving a late review was discriminatory based on leave, is that Dr. Hundahl "wasn't informing me of how he felt I can improve or how I was doing so far or giving me any ability to know or meet what his expectations were." | Undisputed. |
| 85. Dr. Hundahl rated plaintiff as "fully successful" in four of the five elements in the performance review. | Undisputed. |

| | |
|---|---|
| 86. Dr. Hundahl rated plaintiff as "minimally satisfactory" only for the fifth element. | Undisputed. |
| 87. As Surgical Service chief, Dr. Hundahl does not have the power to hire and fire employees. His role is to make recommendations to either the Chief of Staff or the Director and service chiefs frequently seek advice and guidance from Human Resources. | Disputed. Defendant Hundahl's supervisors and HR may review his decision and concur with it but the initial decision is his. (Defendants' Exhibit I at 91:22). In addition, other personnel perceive Defendant Hundahl as the person with the ability to hire and fire. (See, Exhibits B and C). |
| 88. Dr. Hundahl does not have power to determine salaries, only to recommend them subject to approval by the compensation committee and others such as the Chief of Staff or Director. | Disputed. Defendant Hundahl's supervisors and HR may review his decision and concur with it but the initial decision is his. (Defendants' Exhibit I at 91:22). In addition, other personnel perceive Defendant Hundahl as the person with the ability to hire and fire. (See, Exhibits B and C). |
| 89. Dr. Hundahl is not responsible for maintaining employment records. | Undisputed. |
| 90. Dr. Hundahl was not the sole decision maker on plaintiff's performance evaluation; he was the recommending official and the Chief of Staff was the approving official for that evaluation. | Disputed. Defendant Hundahl's supervisors and HR may review his decision and concur with it but the initial decision is his. (Defendants' Exhibit I at 91:22). In addition, other personnel perceive Defendant Hundahl as the person with the ability to hire and fire. (See, Exhibits B and C). |
| 91. Plaintiff's Initial Disclosures, dated December 15, 2011, state as follows:<br><br>Categories of Damages:<br><br>1. Lost Wages – the computation of this category cannot be totally quantified without further discovery.<br><br>2. Lost Benefits, including Federal Employee Retirement Benefits – the computation of this category cannot be totally quantified without further discovery | Undisputed. |
| 92. On December 20, 2011, the Secretary informed plaintiff that his disclosures were deficient and requested that plaintiff provide the required damages computations and supporting documents. The Secretary also informed plaintiff that his disclosures should indicate the damages that plaintiff seeks to | Undisputed. |

| | |
|---|---|
| recover from each defendant, the Secretary and Hundahl. | |
| 93. In his January 3, 2012 first supplemental disclosure, regarding Lost Wages, plaintiff stated that his net bi-weekly VA pay was $6,048.63, but said that "[h]is gross pay is the true measurement of [lost wages], and that amount will be quantified when Plaintiff's discovery requests have been answered." He still did not provide a total amount of lost pay (either net or gross), and he still did not provide any computation of retirement or other damages. | Undisputed. |
| 94. In his February 28, 2012 second supplemental disclosures, plaintiff calculated his lost wages benefits as $20,363.28, stating that his gross bi-weekly salary was $10,181.64 and he was unemployed for two pay periods. But plaintiff still did not disclose any computation of lost retirement or other benefits. | Undisputed. |
| 95. At deposition, plaintiff did not have any estimate of lost retirement benefits, and said that prior to filing the lawsuit he had no idea what he thought his retirement losses were, and that he would be offering an expert on that subject. | Undisputed. |
| 96. In his August 31, 2012 third supplemental disclosure, made at the close of non-expert discovery, plaintiff modified the FERS benefit section by stating that he intended to declare an expert witness to calculate lost FERS benefits. But plaintiff still did not disclose any computation. | Undisputed. |
| 97. The Secretary specifically requested copies of plaintiff's earning statements from 2007 to the present, federal income tax returns for that same period, documents supporting plaintiff's economic damages claims, and documents evidencing any attempts he made to mitigate his damages. But the only documents plaintiff produced in response were plaintiff's VA earning statements (which had been produced to plaintiff in this litigation by the Secretary), and statements regarding his pre-VA military earnings. | Undisputed. This Request for Production of Documents was promulgated by Defendant VA on or around January 3, 2012. Plaintiff observes that in response to RFP No. 6, he stated, "Plaintiff's damages are approximately one month of lost wages and the loss of his federal pension." (Defendants' Exhibit DD, RFP No. 6). |

| | |
|---|---|
| 98. It was not until plaintiff disclosed his expert witness on September 14, 2012, that plaintiff disclosed that he was seeking a total of $675,238 in this case. | Undisputed. |
| 99. Plaintiff initially consulted his expert in November 2011. | Undisputed. |
| 100. Plaintiff's expert has received no formal training regarding FERS benefits and his opinion is based solely on a few documents about FERS provided to him by plaintiff. | Disputed. Plaintiff's expert's actual testimony was "It is possible that I did some searching on the web during that process, but I don't—I don't recall finding anything different than what I found in those." (Defendants' Exhibit FF at 15:23-25). |
| 101. At deposition, plaintiff's expert was uncertain whether he had performed any independent internet research but he confirmed that he did not review any articles on FERS benefits. | Undisputed. |
| 102. In response to questioning about whether he looked for articles on FERS damages in employment discrimination cases, he said that plaintiff provided him with some "settlement guidelines" by the Office of Personnel Management. | Undisputed. |
| 103. Other than the materials he was provided by plaintiff, Davis did not review any FERS rules or regulations. | Undisputed. |
| 104. Davis has only testified in two employment discrimination cases, one in federal court and one in state court. Davis has never testified in a case involving FERS benefits. The instant case is the very first time he has opined on FERS benefits. | Disputed. Davis' actual testimony on cases was that he was in "a couple that I can think of." In addition, he stated that "I've been doing employment cases over a number of years sort of outside the scope of the four years listed here." In addition, he testified that he was "not certain" that he has been (or not) in a case specifically on federal employment retirement benefits. (Defendants' Exhibit FF at 8:13-19 and 13:21-14:8). |
| 105. The key assumptions underlying Davis's opinion are that plaintiff was wrongfully terminated from his Chief of Anesthesiology position at the Sacramento VA Medical Center, and that, if plaintiff had not been wrongfully terminated, then plaintiff's "not to exceed" one-year temporary appointment would have been renewed twice, which would have allowed plaintiff to fulfill the 5 years of federal civil service required to | Undisputed. |

| | |
|---|---|
| vest in FERS. | |
| 106. If plaintiff was not wrongfully terminated, then Davis's entire damages calculation is inapplicable. | Disputed. Davis' actual testimony was "I think that goes axiomatically that if there was no cause, then the damages in a sense stand on their own." (Defendants' Exhibit FF at 27:10-12) |
| 107. He also admitted that he did not know that plaintiff had resigned from his Chief position. | Disputed. Davis' actual testimony was that he didn't recall whether Plaintiff had told him that or not. (Defendants' Exhibit FF at 24:7-9) |
| 108. Davis's assumption that plaintiff's temporary appointment would have been automatically renewed twice is based solely on plaintiff's own deposition testimony that temporary appointments are automatically renewed. | Undisputed. |
| 109. Temporary appointments are not automatically renewed. Instead, the Service Chief recommends renewal or non-renewal, based on factors such as the employee's performance, workload, funding, doctor-to-patient ratio, subject to final approval by the Chief of Staff or Director. | Disputed. "Automatic" from a layperson's viewpoint means that the vast majority of temporary appointments are renewed as a matter of course. (Exhibit F, RFA Nos: 9-18). |
| 110. Although Davis relied on plaintiff's deposition testimony in forming his opinions, Davis's report did not identify the deposition as a document he relied on as required by Rule 26(a)(2)(B). | Undisputed. |
| 111. When asked if he had any factual basis to support that assumption, and whether it is possible that plaintiff would not have been renewed either the first time or the second time, Davis admitted that "there's a universe of possibilities" and that something could have happened in that time. But, regardless, he said that his assumption is "based on the fact that [plaintiff] would have worked the two terms." | Undisputed. |
| 112. Davis admitted that "there is an underlying speculation in the assumption" that plaintiff would have been renewed twice to be able to achieve the FERS benefits. | Disputed. The "underlying speculation in the assumption" was whether Plaintiff would have continued working for two additional years. (Defendants' Exhibit FF at 60:3-7) |
| 113. Davis's calculations are based on an assumption that, had plaintiff continued to work at the VA, he would have been receiving the Chief of Anesthesiology salary. | Undisputed. |
| 114. Davis did not know that plaintiff resigned his Chief position and, that had | Disputed. There was no figure of $25,000 discussed in the deposition excerpt that |

| | |
|---|---|
| plaintiff stayed at the VA, he would have been working as a staff anesthesiologist earning approximately $25,000 less per year than the salary Davis used for his calculations. | Defendants cited to. |
| 115. If plaintiff's salary was $25,000 less, that would wipe out the approximately $18,000 in past damages calculated by Davis and it would also decrease plaintiff's "high 3" salary which would reduce his future FERS benefits, among other things. | Undisputed. This is not actually a fact; it is a hypothetical posed to an expert witness. |
| 116. Davis admitted that the figures he used to calculate the mitigating private sector earnings that he used to offset against the earnings that plaintiff would have earned at the VA are incomplete and that there likely were amounts owed to plaintiff for 2010 that had not yet been paid to plaintiff. He said "there may be an amount there. I did not calculate it, but based on what my discussions with [plaintiff], it would not be a significant amount." | Disputed. Nowhere in the deposition excerpt cited to does Davis admit that the figures are "incomplete." |
| 117. Davis relied solely on what plaintiff told him about unpaid amounts still owed to him and plaintiff's representation that it was a "small amount." When asked if he had any idea what amount was accrued but unpaid for 2010, Davis said "I did talk to [plaintiff] and he said he didn't think it was a significant amount." He confirmed that he had no documents showing what the accrued but unpaid amounts were. | Undisputed. |
| 118. Davis included a 4.7 percent pay raise to plaintiff in his calculations, based on historical data. | Undisputed. |
| 119. There have been no actual raises system-wide at the VA since plaintiff left the VA in 2010. | Undisputed. |
| 120. On October 2, 2012, the Secretary informed plaintiff that his expert relied on documents that had not been produced or disclosed in the litigation and that these documents were required to be disclosed not only in plaintiff's initial disclosures but they also were directly responsive to a number of the Secretary's written discovery requests. | Disputed. It is a fact that Defendant VA made this communication. It is not a fact that the documents were responsive to Defendant VA's discovery requests. |
| 121. The Secretary informed plaintiff that Defendants have been prejudiced by his failure | Disputed. It is a fact that Defendant VA asserted prejudice when requesting the |

| | |
|---|---|
| to disclose the documents and, without waiving defenses, asked to receive the documents. | documents but Defendant VA has not shown, nor can it show, any prejudice. |
| 122. Plaintiff produced the documents the expert cited in his report on October 4, 2012, with his fourth supplemental Rule 26 disclosures. | Undisputed. |

Date: January 2, 2013

LAW FIRM OF JOANNE DELONG

By: /s/ Joanne DeLong
Joanne DeLong
Attorney for Plaintiff Dr. Matthew Bonzani