1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                   FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10   MATTHEW BONZANI,                          No.  2:11-cv-07-EFB

11                Plaintiff,

12        v.                                   ORDER AND FINDINGS OF FACT AND
                                               CONCLUSIONS OF LAW
13   ROBERT A. McDONALD, Secretary of
     Veterans Affairs; and SCOTT HUNDAHL,
14   M.D.,

15                Defendants.

16

17        This matter proceeded to a hybrid bench and jury trial on October 20, 2015, through

18   October 24, 2015, and October 27, 2015, through October 30, 2015, on plaintiff Matthew

19   Bonzani's claims under the Family Medical Leave Act ("FMLA") against defendants Robert A.

20   McDonald, the Secretary of Veterans Affairs (the "Secretary"), and Scott Hundahl, and plaintiff's

21   claim under section 501 of the Rehabilitation Act against the Secretary.[1]  Plaintiff was

22   represented by attorneys Joanne DeLong and Mark Wasser; defendants were represented by

23   Assistant United States Attorneys Lynn Ernce and Alyson Berg.

24        Plaintiff's Rehabilitation Act claim against the Secretary was tried to the jury.  Although it

25   was previously determined that plaintiff's FMLA claim against defendant Hundahl would also be

26   tried to a jury, the parties subsequently stipulated to have one element of that claim, i.e., the issue

27

28   _____

     [1]  This action was reassigned to the undersigned based on the consent of the parties.  *See*
     ECF No. 18; *see also* E.D. Cal. L.R. 305; 28 U.S.C. § 636(c).

                                             1

of whether Hundahl was an "employer" for purposes of liability under the FMLA, resolved by the court.  Plaintiff's FMLA claim against the Secretary was also tried to the court.  All other issues proceeded in a jury trial.  The jury returned a verdict in favor of the Secretary on plaintiff's Rehabilitation Act claim.[2]  ECF No. 177.  However, the jury found in favor of plaintiff on the FMLA claim against Hundahl.  ECF No. 178.  It found that defendant Hundahl interfered with plaintiff's rights under the FMLA and that plaintiff had sustained damages in the amount of $675,238.  After the jury returned its verdict, defendants moved for judgment as a matter of law and for a new trial on plaintiff's claims under the FMLA.[3]

Having carefully reviewed the evidence and the arguments of the parties presented at trial and in their written submissions, the court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52 on the FMLA claim against the Secretary and the employer status issue as to the FMLA claim against Dr. Hundahl.

Further, for the reasons stated below, defendants' motions are denied.

I.    Procedural History

Plaintiff Matthew Bonzani, M.D., is a former anesthesiologist at the Sacramento VA Medical Center in Sacramento, California.[4]  On December 31, 2010, he filed a complaint against

---

[2]  At the completion of plaintiff's case-in-chief, the court took under submission the Secretary's motion for judgment as a matter of law on the Rehabilitation Act claim.  In light of the jury's verdict in favor of the Secretary on that claim, the motion is now moot.

[3]  Defendants also moved for judgment notwithstanding the verdict.  The motions are redundant.  Rule 50 was amended in 1991 to abandon the terminology of motions for "directed verdict" and "judgment notwithstanding the verdict."  Fed. R. Civ. P. 50, Advisory Committee Notes, 1991 Amendment.  Motions denominated as such are now treated as motions for judgment as a matter of law.  *Id.*  Such a motion may be bought under Rule 50(a) at any time after the plaintiff rests but before the case is submitted to the jury.  If such a motion was properly presented under Rule 50(a), the motion may be renewed under Rule 50(b) after a verdict is returned.  Defendants presented a Rule 50(a) motion and the court addresses the renewed motion herein under Rule 50(b).  The motion for judgment as a matter of law made after the jury has returned a verdict is reviewed under the same standard as the motion for judgment as a matter of law made at the close of all evidence.  *See Fernandez v. City of San Francisco,* No. C-93-2597, 1996 WL 162993, at *2 (N.D. Cal. Mar. 18, 1996) (citing *The Jeanery, Inc. v. James Jeans, Inc.,* 849 F.2d 1148, 1151 (9th Cir. 1988)).

[4]  That medical facility is located at the site of the former Mather Air Force base and was referred to by several witnesses as "VA Mather" or simply "Mather."

defendants Eric K. Shinseki, Secretary of Veterans Affairs (the "Secretary"),[5] Scott Hundahl, M.D., a doctor at the Sacramento VA Medical Center.  The complaint asserted claims under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq. ("Rehabilitation Act"), and the Family Medical Leave Act ("FMLA"), and 5 U.S.C. § 2302.  Compl., ECF No. 1.  On September 26, 2011, the court granted in part and denied in part defendants' motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6).  ECF No. 28.  Plaintiff's Section 504 Rehabilitation Act claim as to all defendants was dismissed without leave to amend.  His Section 501 Rehabilitation Act claim against defendant Dr. Hundahl was also dismissed without leave to amend.  Plaintiff's attempt to state a claim under § 2615(a)(2) or § 2615(b) of the FMLA also failed and any such claim was dismissed with leave to amend.  His claim under 5 U.S.C. § 2302 as to all defendants was dismissed without leave to amend.  *Id.*  Defendants' motion to dismiss plaintiff's claim under § 2615(a)(1) of the FMLA was denied.  *Id.*

Because plaintiff did not file an amended complaint, his remaining claims were: (1) a Section 501 Rehabilitation Act claim against the Secretary, and (2) a claim under § 2615(a)(1) of the FMLA against all defendants.  ECF No. 32 at 2.  On December 14, 2012, defendants moved for summary judgment on all claims.  ECF No. 42.  That motion was denied (ECF No. 63) and the matter proceeded to trial on the remaining claims.

II.   Factual Background

The evidence and testimony presented at trial demonstrated the following.

Plaintiff served in the United States Air Force from July 1, 1986, to February 12, 2007. He testified that upon graduation from the Air Force Academy in 1990, he trained to become a combat pilot and eventually took part in combat operations during the Gulf War.  After completing two tours, he returned home and was stationed in North Carolina.  He attended

/////

/////

---

[5]  Eric Shinseki was the Secretary of Veterans Affairs at the time this action was initiated. Robert McDonald is the current Secretary of Veterans Affairs and was substituted as the proper defendant pursuant to Fed. R. Civ. P. 25(d).

medical school, completed a residency in anesthesiology, and eventually served in the Air Force as an anesthesiologist.[6]

Due to a variety of medical impairments, plaintiff was medically discharged from the Air Force in early 2007. He subsequently sought and was offered a position at the VA medical center in Sacramento. His employment commenced with the VA on March 18, 2007, and although his employment was extended, he was initially appointed for a one-year term not to exceed March 18, 2008. Defs.' Ex. K.

At the time plaintiff started working for the VA, there was no permanent Chief of Anesthesiology. After a few months on the job, he expressed to Dr. Hundahl, the Chief of Surgical Services and plaintiff's immediate supervisor, an interest in taking on the role of Chief. Dr. Hundahl thought it was a good idea. Plaintiff started acting as Chief on an informal basis in September 2007, and officially became the Chief of Anesthesiology on November 11, 2007.

In March 2008 plaintiff's term appointment was extended for another one-year term. The renewal process, which plaintiff described as "pretty automatic," involved little more than signing and submitting documents. On April 24, 2008, plaintiff received a letter signed by five members of the anesthesia department that, while expressing appreciation for him taking on the role as Chief, highlighted problems that needed to be addressed. Defs.' Ex. B. The crux of the letter addressed a recurrent problem at the facility: an inadequate number of anesthesiologists and the resulting scheduling conflicts and associated problems that created. The group requested that plaintiff attempt to obtain more staff to assist the anesthesiologists, make schedules and work assignments well in advance, appoint an interim Chief for when plaintiff was absent, create a schedule that realistically accounts for the number of cases that could be completed each day, and create a calendar of the anesthesiologists' daily staffing so the group could anticipate how many anesthesiologists are expected to work each day and in which operating room they were assigned to work. *Id.*

/////

---

[6] Plaintiff testified that while participating in pilot training exercises he sustained an injury that ultimately ended his career as a pilot and he decided to pursue a career in medicine.

On September 10, 2008, four members of the anesthesia department sent plaintiff a follow-up letter.  Defs.' Ex. C.  This letter expressed concern that the issues previously raised were not adequately addressed.  *Id.*  Specifically, the group felt that plaintiff had not made a strong effort to pursue additional support staff, had not made staffing and call schedules well in advance, did not effectively communicate with the appointed interim Chief, and failed to enforce certain rules.  *Id.*

As indicated from these letters, the anesthesia group struggled with related issues of staffing and scheduling problems.  The anesthesia department was authorized to employ six anesthesiologists.  However, the VA experienced difficulty recruiting and maintaining qualified anesthesiologists and therefore the six positions were not always filled.  Plaintiff specifically testified that during the majority of his tenure with the VA his department was understaffed.

The lack of staffing created significant problems with how the VA's operating rooms functioned.[7]  Typically, the Sacramento VA facility would try to run four operating rooms.  This required five anesthesiologists to smoothly run all four rooms; one working in each room and one "floater" to relieve the other anesthesiologists for breaks or lunch, or to respond to emergencies, as needed.  In the event one anesthesiologist was out on vacation or ill, there was little room for flexibility (even assuming all six positions were staffed).  If one of the scheduled anesthesiologists called in sick at the last minute, the VA would experience severe difficulties running all four operating rooms and on several such occasions surgeries had to be cancelled.  If the group had prior notice that they were going to be short-staffed, plaintiff, as Chief of Anesthesiology, could arrange for a fee basis physician[8] to fill in for the absent physician.  However, fee basis physicians are expensive, and it can be difficult to obtain these physicians, especially without adequate notice.

/////

---

[7]  This was a theme expressed in the testimony of several witnesses.  As discussed below, the testimony in general presented an overarching problem of too few anesthesiologists being asked to handle more cases than the existing staff levels could service.

[8]  Fee basis physicians, also called locum tenens, are physicians that work as independent contractors.  These physicians fill in as needed and are not employees of the VA.

1    The problems with staffing and scheduling were exacerbated after April 28, 2009.  While
2    working in one of the operating rooms on that date, plaintiff reached underneath the operating
3    table to check the patient's Foley catheter bag, when his knee suddenly gave out.  It was
4    subsequently determined that he suffered a meniscal tear, which would require surgery.  After
5    applying for workers' compensation benefits, plaintiff was evaluated by a physician who
6    recommended plaintiff be limited to light work, which excluded working in an operating room.
7    However, given the severe staffing issues, plaintiff continued to perform his duties despite this
8    recommendation.

9    On May 5, 2009, plaintiff sent Dr. Hundahl an email stating that he had sustained an
10   injury to his knee at work the prior week and that he would likely need surgery.  Pl.'s Ex. 91.
11   Plaintiff sent a follow-up email on May 19, 2009, apprising Dr. Hundahl that plaintiff had been
12   experiencing greater pain in his knee, which necessitated pain medication.  Pl.'s Ex. 92.  Plaintiff
13   stated that he was still waiting to see an orthopedic surgeon, but the process had been delayed
14   because his case involved a workers' compensation claim.  *Id.*  He further indicated that he did
15   not believe he would be able to continue working in the operating room due to pain and the need
16   to take pain medication.  *Id.*  On May 21, 2009, plaintiff sent a third email to Dr. Hundahl, this
17   one stating that plaintiff's workers' compensation claim had been approved and that he was in the
18   process of making arrangements to take leave.  Pl.'s Ex. 93.  Dr. Hundahl did not respond to any
19   of these emails.

20   Plaintiff subsequently took FMLA leave to have surgery on his knee, which was
21   performed on June 2, 2009.  While out on FMLA leave, but prior to having surgery, plaintiff
22   emailed Dr. Hundahl to confirm his surgery date and address staffing issues.  Plaintiff stated that
23   the anesthesia department would be extremely short-staffed due to one physician being out on
24   annual leave[9] for a planned vacation, another physician being out with pneumonia, and plaintiff
25   unable to work due to his knee injury.  Joint Ex. J-19.  There was also no response to this email.

26

27   [9]  Annual leave and vacation leave were used interchangeably to describe leave taken for
     vacation, as oppose to sick leave.
28

1   However, on June 16, 2009, Dr. Hundahl sent an email to all anesthesia staff. Pl.'s Ex. 95. In

2   this email, Dr. Hundahl expressed concerns about scheduling and physicians taking leave.

3   Specifically, Dr. Hundahl stated that the anesthesiologists were not properly entering their leave

4   requests into VistA, the system utilized by the VA for formally requesting leave. *Id.*

5       For an anesthesiologist to take leave, he or she was required to submit a formal request

6   through VistA. Plaintiff had a leave calendar in his office for the anesthesia group's use, but the

7   official calendar was located in Dr. Hundahl's office.[10] *See* Defs.' Ex. S. Although plaintiff was

8   the Chief of Anesthesiology, and was ultimately responsible for de-conflicting the leave calendar,

9   i.e. making sure an appropriate number of anesthesiologists were available and scheduled to cover

10  the operating rooms, he was not permitted to approve leave. All leave requests were required to

11  be submitted though VistA. Dr. Hundahl insisted that he approve all such requests. Despite this

12  fact, Dr. Hundahl's June 16, 2009 email noted that there were "problem days" in August, as two

13  anesthesiologist were scheduled to be out on leave on August 17 and 24, in violation of the VA's

14  policy that only one anesthesiologist be out on annual leave at a time. *Id.*

15      After taking a few weeks to recover, plaintiff returned to work on July 13, 2009. Upon his

16  return Dr. Hundahl stopped by plaintiff's office to discuss problems that occurred in plaintiff's

17  absence, including the failure to de-conflict the leave calendar. Plaintiff testified that during their

18  conversation Dr. Hundahl was yelling and pounded his fists against plaintiff's desk.[11] Dr.

19  Hundahl was upset about anesthesiologists calling in sick and surgeries having to be canceled

20  because there were not enough anesthesiologists to run the operating rooms.

21      Plaintiff also testified that upon his return, his relationship with Dr. Hundahl changed

22  significantly. Dr. Hundahl no longer addressed plaintiff on a first name basis, and started

23  referring to plaintiff as Dr. Bonzani. Plaintiff also experienced difficulty arranging informal

24  /////

25  _____

26      [10] The official calendar was originally in plaintiff's office, but was moved to Dr.
    Hundahl's office on June 16, 2009, two weeks after plaintiff's knee surgery.

27      [11] Dr. Hundahl disputed yelling at plaintiff, but did state it was possible that he raised his

28  voice.

1   meetings with Hundahl, and overall there was a fundamental breakdown of communication

2   between the two.

3        On August 21, 2009, Dr. Hundahl had a meeting with the anesthesia group concerning the

4   VA's leave policy.  At this meeting, at least one member of the group requested that the VA

5   abandon its policy that a request for annual leave be submitted 30-days in advance, or that at least

6   in certain situations employees be permitted to submit a request for leave on shortened notice.

7   The request was denied.  Defs.' Ex. M at 2.  Plaintiff testified, however, that the group discussed

8   the possibility of allowing anesthesiologists to use annual leave on short notice when the VA

9   would not be running all four operating rooms.  Under such circumstances, the VA would not

10  need all five or six anesthesiologists to work.

11       Just prior to that meeting, on August 17, 2009, plaintiff received a court order directing

12  him to appear for mediation ten days later on August 27, 2009, in relation to a child custody

13  dispute.  *See* Pl.'s Ex. 25.  Upon receipt of the order, plaintiff submitted a request to take annual

14  leave on August 27, 2009.  A little over a week later, on August 25, 2009, he also submitted a

15  request to take annual leave on August 26, 2009.  According to plaintiff, he was feeling under the

16  weather at the time, and decided to submit a request for annual leave instead of calling in sick

17  because it was his understanding that the VA would only be running two operating rooms on

18  August 26.  Accordingly, plaintiff believed his presence would not be needed on August 26 and

19  27.  Both requests for leave were denied by Dr. Hundahl based on plaintiff's failure to submit the

20  requests 30-days in advance as required by the VA's leave policy.

21       Plaintiff returned to work the following Monday, August 31, 2009, and met with Dr.

22  Hundahl.  According to plaintiff, Dr. Hundahl yelled at him and told him that he was Absent

23  Without Leave ("AWOL") on August 26 and 27.  Plaintiff received a formal Written Counseling,

24  notifying him that he was AWOL for two days because he "failed to schedule his leave 30 days in

25  advance, and [he] failed to obtain permission from [his] supervisor, Dr. Hundahl, for the absence

26  as required."  Joint Ex. J-7.  The AWOL for August 27, 2009 was subsequently rescinded upon a

27  sufficient showing that plaintiff's absence was required to participate in court-ordered mediation.

28  Joint Ex. J-9.

On September 29, 2009, Dr. Hundahl sent an email to Dr. William Cahill, the Chief of Staff, and Dr. Brian O'Neill, the Director of Health Care System.[12]  Pl.'s Ex. 102.  In the email Dr. Hundahl stated, "As you know, I will not be renewing Dr. Bonzani's 1 year NTE contract (expiring in March, 2010)."  *Id.*  Significantly, in response, Dr. O'Neill stated, "What does it mean that you won't be renewing Bonzani's 1 year contract?  You mean he is losing his job."  *Id.*  Dr. Hundahl responded in the affirmative, and further stated that Dr. Cahill "is aware of some of the issues.  Suffice it to say that we've experienced some serious performance issues and reliability issues."  Dr. O'Neill's responded, "All I care about is that we don't end up with an expensive law suit that can be avoided.  It seems so uncomplicated not to extend an appointment, but often, if used selectively, it can be regarded as an adverse action, then you need supporting documents."  *Id.*

On December 1, 2009, without any knowledge of the September 29 email, plaintiff provided a letter to Dr. Hundahl in which plaintiff stated that he wanted to step down as Chief of Anesthesia effective January 1, 2010.  Joint Ex. J-1.  He further stated that it was his "desire to serve the VA as a staff anesthesiologist as I was originally hired to do."  *Id.*

On January 6, 2010, plaintiff had a meeting with Dr. Hundahl and Carol Ross, Dr. Hundahl's administrative assistant.  At this meeting plaintiff was given a memo acknowledging receipt of his December 1, 2009 letter.  Joint Ex. J-2.  The memo also stated that plaintiff would be permitted to step down as Chief even though VA policy ordinarily required that a replacement be obtained first.  It also notified plaintiff that he was being fired.  Specifically, it stated that his one-year employment with the VA was set to expire on March 18, 2010, and that his employment contract would not be renewed.

After the January 6 meeting word spread of the decision to not renew plaintiff's employment.  In response to the decision, Dr. Jon Baker, a thoracic surgeon employed by the VA, drafted and circulated a petition to retain plaintiff.  Pl.'s Ex. 8.  The petition explained that the VA was already very short-staffed of anesthesiologists, and the operating rooms were not able to

---

[12]  Dr. O'Neill was the Director of the Health Care System from 2006 to 2013.

1   run at full capacity due to the existing shortage.  It further stated that "We need Dr. Bonzani, a

2   competent board certified anesthesiologist, who is a known commodity at the VA."[13]  *Id.*

3       Despite the support shown by several of his peers, the decision to not renew plaintiff's

4   employment stood and plaintiff's employment ended on March 18, 2010.

5   III.   Discussion

6       A.   FMLA Claim Against the Secretary

7       As noted, the plaintiff's claim against the Secretary under the FMLA was tried to the

8   court.  In addition to the facts recited above, the court enters the following findings of fact and

9   conclusions of law as to that claim.[14]

10      "The FMLA creates two interrelated substantive rights: first, the employee has a right to

11  use a certain amount of leave for protected reasons, and second, the employee has a right to return

12  to his or her job or an equivalent job after using protected leave."  *Bachelder v. Am. W.*

13  *Airlines*, 259 F.3d 1112, 1122 (9th Cir. 2001) (citing 29 U.S.C. §§ 2612(a), 2614(a)).  Congress

14  has made it unlawful for an employer to interfere with, restrain, or deny an employee's exercise

15  or attempt to exercise those rights.  29 U.S.C. § 2615(a)(1).

16      The Department of Labor's FMLA implementing regulations provide that "'[i]nterfering

17  with' the exercise of an employee's rights [under 29 U.S.C. § 2615(a)(1)] would include, for

18  example, not only refusing to authorize FMLA leave, but discouraging an employee from using

19  such leave," and that § 2615(a)(1)'s prohibition on "interference" also prohibits an employer from

20  discriminating or retaliating against an employee for having exercised or attempted to exercise

21  FMLA rights.  29 C.F.R. § 825.220(b), (c).  Such discrimination or retaliation includes "us[ing]

22  the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions

23  or disciplinary actions . . . ."  *Id.* § 825.220(c); *see also Xin Liu v. Amway Corp.*, 347 F.3d 1125,

24  1133 (9th Cir. 2003) (providing that "any violation . . . of the DOL regulations constitute[s]

25  interference with an employee's rights under the FMLA."); *Bachelder*, 259 F.3d at 1122

26  _____

    [13]  Plaintiff's competency as an anesthesiologist is not disputed.

27

    [14]  Most of these facts also apply to the separate analysis below as to defendant Hundahl's

28  motion to vacate the jury verdict.

1    ("[e]mployers cannot use the taking of FMLA leave as a negative factor in employment actions,

2    such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under 'no

3    fault' attendance policies").

4         To prevail on his FMLA claim, plaintiff was required to establish the following elements

5    by a preponderance of the evidence: (1) he was eligible for FMLA leave; (2) his employer was

6    covered by the FMLA; (3) he was entitled to FMLA leave; (4) he provided sufficient notice of his

7    intent to take leave; and (5) his employer used his taking of FMLA leave as a negative factor in

8    not renewing his employment. *Sanders v. Newport*, 657 F.3d 772, 778 (9th Cir. 2011); *see also*

9    *Xin Liu*, 347 F.3d at 1132-1133.

10        It is undisputed that plaintiff injured his knee on April 28, 2009, that he took medical

11   leave beginning in May 2009, had surgery on his knee in June 2009, and returned from medical

12   leave on July 13, 2009.  ECF No. 118 at 3, ¶¶ 16-20.  The parties also agree that plaintiff's use of

13   leave for that period was protected by the FMLA and that the Secretary was an "employer" under

14   the FMLA.  *Id.*  However, they disputed at trial whether plaintiff's use of the FMLA protected

15   leave was used as a negative factor in the decision not to renew plaintiff's employment.

16        Defendants argued that plaintiff's employment was not renewed because he failed to

17   follow VA policies when he failed to report for work on August 26, 2009, that he mismanaged

18   anesthesia resources and vacation schedules, and that he was an ineffective leader.  While there

19   were undoubtedly serious staffing shortages that led to a number of problems at the facility, these

20   proffered justifications for terminating plaintiff's employment are not supported by the evidence

21   presented at trial.

22        Defendants placed heavy emphasis on plaintiff being found AWOL on August 26,

23   arguing that being AWOL is not protected by the FMLA.  In fact, plaintiff was charged with two

24   consecutive AWOLs; one for August 26, the other for August 27.  The evidence shows that rather

25   than making a careful inquiry into either, Dr. Hundahl readily seized the opportunity to charge

26   plaintiff with the serious accusation of failing to report for surgeries on days that he was supposed

27   to be there.  The facts surrounding the two AWOL charges call into question whether either was

28   genuine.

1    Taking the first (the August 27 AWOL), as soon as plaintiff learned that a court-ordered

2    mediation had been scheduled, he submitted a request for leave in VistA.  Although the VA's

3    leave policy generally required requests for annual leave to be submitted 30 days in advance,

4    employees were expressly entitled to use annual leave for court-ordered appearances.  Here,

5    plaintiff requested leave to attend a court-ordered mediation for which he received less than 30

6    days' notice.  Notwithstanding the VA's policy for court ordered appearances, Dr. Hundahl

7    denied the request because it was not submitted 30 days prior.  When plaintiff was absent from

8    work, he was found to be AWOL.  That AWOL finding was subsequently rescinded because

9    plaintiff's absence was required by a court order, but this rescission did not occur until January

10   22, 2010, long after plaintiff had been notified that his employment would not be renewed.  Thus,

11   while defendants insist that the January 2010 rescission of the AWOL charge shows that

12   plaintiff's use of leave on August 27, 2009 was neither considered nor used as a negative factor in

13   terminating plaintiff's employment, that conclusion is a non-sequitur.  Dr. Hundahl

14   communicated his decision to fire plaintiff on September 29, 2009, when Dr. Hundahl wrote to

15   Dr. Cahill that he would not be renewing plaintiff's contract.  Pl.'s Ex. 102.  Dr. Hundahl had

16   clearly made up his mind by September 29 to terminate plaintiff's employment.  Whatever Dr.

17   Hundahl's motivation was on that date, it could not have been influenced or mitigated by an event

18   that occurred the following January.  To suggest otherwise detracts from the overall credibility of

19   the various reasons articulated for firing plaintiff, which is the very relevance of the August 27

20   AWOL charge.

21   Having eliminated the AWOL charge for August 27 as a reason, the defense pointed to the

22   absence on August 26.  Plaintiff testified that on August 25 he was not feeling well.  According to

23   plaintiff, it was his understanding that the VA was scheduled to run only two operating rooms the

24   following day.  He therefore decided to submit a request for annual leave based on his

25   understanding that the other members of his group would be able to cover the scheduled cases.

26   Plaintiff testified that he felt worse when he woke up on August 26.  He called the VA at 6:00

27   a.m. that morning and spoke to Dr. Janet Donald, also an anesthesiologist.  Plaintiff stated that he

28   was told that the VA was only running two operating rooms, so he decided to stay home sick.

Plaintiff subsequently submitted to Dr. Hundahl medical notes from two different physicians. The first note was dated September 1, 2009, and stated that the physician had evaluated plaintiff on that day and that plaintiff was not able to work from September 1 through his return on September 3, 2009. Pl.'s Ex. 44. The second note was not dated but stated that plaintiff was examined on August 26, 2009, and that he was unable to work from August 26 until September 2. Pl.'s Ex. 45. Plaintiff testified that he did not obtain the second doctor's note at the time of the examination, but he requested it later following the tension he had observed at work from his having taken leave.

Defendants argue that the fact that plaintiff first submitted a request for annual leave and then called in sick the morning of August 26 shows he was not truthful in his claim of being sick. But the fact remains he was examined by a physician on August 26, and that physician certified that plaintiff was not able to work starting on August 26, through September 2. *Id*. There is no evidence to support any assertion that the certifying physician falsely stated plaintiff's condition. The evidence demonstrates and the court finds that plaintiff was absent from work on that day due to illness. Further, testimony at trial established that VA employees were permitted to take leave when they were sick, and that such leave did not require 30 days' notice.

Defendants argue that even assuming plaintiff was ill on the morning of August 26, charging him with being AWOL was nonetheless appropriate because he failed to inform the appropriate supervisor that he would be out sick. Dr. Cahill testified that plaintiff was required to call Paz Sarao, the surgical services timekeeper. But according to Dr. Cahill, Ms. Sarao's shift did not begin until 8:00 a.m. and plaintiff was scheduled to be at the hospital to participate in surgery at 7:00 a.m. Calling Ms. Sarao at 8:00 a.m. offers nothing in the way of practical assistance to those needing to know prior to 7:00 a.m. that Dr. Bonzani would not be among the available anesthesiologists to cover any surgeries scheduled for 7:00 a.m. But there was an informal practice available that would. Plaintiff testified that although there may have been some formal policy that employees call Ms. Sarao, it was common practice for employees who were ill to call the hospital between 6:00 a.m. and 7:00 a.m. and notify the individual answering the phone that the employee would be out sick. Plaintiff testified that he followed this practice and told Dr.

13

1    Donald[15] that he would be out that day and argued that notifying the wrong individual that you

2    would be staying home sick hardly justifies the termination of plaintiff's employment.

3         In light of all of the testimony and documentary evidence, the court simply cannot credit

4    the explanation that Dr. Bonzani's employment as an anesthesiologist was not renewed because

5    he did not call Ms. Sarao the morning of August 26 or that he was otherwise considered AWOL

6    that day.  Regardless of formalities as to whom one should call, the court credits plaintiff's

7    testimony that he was sick and his testimony that he called Dr. Donald before 7:00 a.m. so that

8    surgery teams would know that plaintiff would not be available to administer anesthesia that day.

9         Immediately charging Dr. Bonzani with being AWOL for being out sick on August 26,

10   also stands in contrast to how sick leave by others, who had not been on extended leave for

11   surgery, were accommodated.  Plaintiff cites Dr. Wang's use of sick leave as an example.  Dr.

12   Wang, a member of his anesthesia group, left work to go to the dentist without notifying a

13   supervisor or, according to her supervisor, Bonzani, without submitting a request for leave.

14   Whereas plaintiff was promptly charged with being AWOL, Dr. Wang was not charged as

15   AWOL.  Dr. Hundahl indicated that Dr. Wang's sick leave request was submitted in the VistA

16   system based on a dental emergency.  However, plaintiff submitted a request for leave, albeit for

17   annual leave, and called in sick the morning of August 26.  While minor differences can be

18   identified as to the two instances, the salient distinguishing feature appears to be the sudden

19   deterioration of the working relationship between Hundahl and Bonzani after Bonzani's extended

20   absence for surgery.  This breakdown of the relationship coincided with Hundahl's confrontations

21   with Bonzani over his use of leave and suggests that the motive for the difference in treatment

22   was the frustration over the extended absence for surgery.  Following his protracted absence, the

23   working relationship was troubled, at best.  The perfunctory AWOL charges[16] shortly after taking

24

25   [15]  Defendants argue that Dr. Donald, who testified at trial, was never asked by plaintiff's
     counsel about plaintiff calling her that morning.  But neither did defense counsel ask that
26   question.  Thus, the only testimony at trial on the matter was plaintiff's testimony that he did call
     her and the court credits that testimony.

27
     [16]  It does not appear that Dr. Hundahl fully investigated the circumstances of plaintiff's
28   leave on August 26 and 27.  The written counseling was issued on August 31, 2009, the first

leave for surgery, the disparity in treatment and the proximity to the heated exchange upon

plaintiff's return from surgery suggests that the August 26 AWOL was issued to support the soon

to be announced decision by Dr. Hundahl's to terminate plaintiff's employment. Indeed, the

written counseling was issued within one month of Dr. Hundahl's email stating that he would not

be renewing plaintiff's employment. *See* Joint Ex. J-7; Pl.'s Ex. 102.

The testimony plainly established that after plaintiff's absence from work for the surgery

on his knee there was a paradigm change in his relationship with Dr. Hundahl, to the point that it

was nearly nonexistent. Both confirmed that their meeting upon plaintiff's return to work on July

13, 2009 was heated and confrontational. Plaintiff described Dr. Hundahl as yelling and

pounding his fist. Dr. Hundahl said that he pounded his fist not out of anger but because he did

not have plaintiff's attention. Hundahl Tr., ECF No. 186 at 8. Either way, Dr. Hundahl conceded

his frustration and that he might have raised his voice. Thereafter, communication became

strained and ineffective. The use of leave on August 26 might have further fueled Dr. Hundahl's

frustration but the testimony does not credibly establish that plaintiff's absence on August 26 and

not his absence from June 2, to July 13, 2009, when he took leave for surgery and recovery, was

the principal reason for not renewing Dr. Bonzani's employment as an anesthesiologist.

Further, it simply is not credible that an anesthesiologists would be let go over the

inconsequential policy deviations for taking sick leave identified by Hundahl. The witnesses

uniformly testified that there was a critical need for anesthesiologists at the Sacramento VA

Medical Center. The shortage was cited numerous times as causing surgeries to be cancelled on

the very day they had been scheduled[17] and creating a need to hire contract doctors at a very

expensive rate.[18] It is simply not credible that the incident on August 26 was the reason that a

---

business day following plaintiff's absence and it appears that Hundahl already poised to use
plaintiff's absence as an opportunity to find plaintiff in violation of VA policy, particularly when
viewed in light of the proximity of that counseling to plaintiff's return from FMLA leave.

[17] Indeed, there was testimony that surgeries were cancelled on the day Dr. Wang had to
leave for a dental emergency. Pl. Tr., ECF No. 190 at 5-6.

[18] Dr. O'Neill testified that although the facility was approved for six anesthesiologists
during the relevant time, there were times when less than six were actually working there.

15

1  doctor who the defense concedes was qualified and performed well as a staff anesthesiologist was

2  terminated.  As discussed below, the need for such anesthesiologists was simply too great for that

3  incident to explain the termination.

4         Neither can the court credit the assertion that plaintiff's employment was terminated

5  because he failed to adequately de-conflict the leave calendar.  Plaintiff met with Dr. Hundahl

6  immediately after returning from leave for his surgery.  As noted, Dr. Hundahl was emphatic over

7  his frustration that surgeries had to be canceled due to anesthesiologist being out on leave and

8  calling in sick.  Further, there is no dispute that as the Chief of Anesthesiology, one of plaintiff's

9  duties was to de-conflict the leave schedule for the section.  But there is also ample evidence that

10 the conflict in leave schedules and the need to cancel surgeries due to a shortage of Sacramento

11 VA anesthesiologist did not begin or end with Dr. Bonzani.  Dr. Baker pointedly testified that

12 almost every VA is short of anesthesia providers (Baker Tr., ECF No. 191 at 5), that the

13 Sacramento facility was always short of anesthesiologists, and still is (*id.* at 6).  Thus, while this

14 task may not have been adequately performed by plaintiff prior to taking leave and consequently

15 there were insufficient  anesthesiologists to cover all the operating cases, it apparently has not

16 been properly performed by anyone and likely cannot be with the short staffing levels at this

17 facility.  Thus, while the court cannot fault Dr. Hundahl's frustration over surgeries being

18

19 O'Neill Tr., ECF No. 189 at 4-6.  Dr. Hundahl also acknowledged that the Sacramento VA
   facility was thin-staffed and if two anesthesiologists are out and another gets sick it would create
20 an extremely difficult problem.  Hundahl Tr., ECF No. 186 at 18.  On some occasions, surgeries
   had to be cancelled with enormous disruption to patients and their families (*id.* at 8-9) and on
21 other occasions a contract or fee-based anesthesiologists who are difficult to acquire would have
   to be hired at a much higher cost to the VA.  *Id.* at 9, 28, 30, 44.  Although Dr. Hundahl attributed
22 problems of understaffing to what he viewed as plaintiff's poor management, he acknowledged
   that other members of the surgery staff considered the Sacramento VA to be short-staffed.  *Id.* at
23 60.  An eye surgeon had complained that one of his patients was canceled three times and another
   surgeon complained that he had 15 patients cancelled.  *Id*. at 32; Joint Ex. J-8.  Dr. Hundahl also
24 acknowledged that there was a widespread perception in the anesthesia department that it was
   short-staffed.  ECF No. 186 at 33.  Dr. Baker, a thoracic surgeon, testified that the VA is
25 chronically short of anesthesiologist and in order to run operating rooms it uses costly locum
   tenems (contract doctors) to try to fill spots.  Significantly, he added that as of the time of trial the
26 Sacramento VA is still short of anesthesiologists and still has to cancel surgeries.  Barker Tr.,
   ECF No. 191 at 6.
27

28

1   cancelled due to anesthesiologists being out on leave,[19] the FMLA does not permit using Dr.

2   Bonzani's absence to have surgery as a negative factor in a decision to end his employment.  It is

3   clear to the court that this is precisely what occurred here.

4        The evidence could not have demonstrated any more clearly that the VA has suffered

5   from staffing shortages.  This problem was necessarily exacerbated by plaintiff's absence due to

6   his unforeseen injury.  Undoubtedly, this frustrated Dr. Hundahl.  With plaintiff out on FMLA

7   leave, all other anesthesiologists would have been required to work every day for the VA to run

8   four operating rooms with a floater.  Over an extended time, as occurred with plaintiff's medical

9   absence, that is simply not practical.  If one anesthesiologist was out on annual leave, and another

10  called in sick, the VA would not have been able to run its four operating rooms with plaintiff out

11  on FMLA leave.  Under such circumstances, the VA is left to find fee basis anesthesiologist or

12  face canceling surgeries.  As Dr. Hundahl testified, it was difficult to get a fee basis

13  anesthesiologist with less than 30-days' notice.  Thus, cases were cancelled.

14        But placing responsibility for all of these consequences at the feet of plaintiff to explain

15  the termination of his employment simply contradicts the evidence and testimony at trial.  Despite

16  having been given the title Chief of Anesthesiology, he lacked the authority to approve leave

17  requests submitted by members of his department.  Dr. Hundahl, not plaintiff, controlled leave

18  approval.  All leave requests had to be submitted through VistA for Dr. Hundahl's approval.

19  Thus, if two anesthesiologists were out on annual leave on the same day, it would be because Dr.

20  Hundahl approved both of their requests for leave.  Thus, cases were canceled for reasons beyond

21  plaintiff's control.  While defendants want to make plaintiff responsible for authority exercised by

22  others, he simply lacked the authority to approve leave and had no control over other

23  anesthesiologists calling in sick.  Although plaintiff's extended absence undoubtedly adversely

24  impacted the VA's ability to perform scheduled cases, he was entitled to take leave under the

25  FMLA to recover from his injury.

26   _____

27        [19]  The court is convinced that Dr. Hundahl's primary consideration was providing needed
     medical care to patients.  His motives are not questioned in that regard.  The problem arises with
     how to deal with inadequate staffing when an employee must be gone for medical reasons.

28   Alternative solutions must be found other than punishing an employee for using protected leave.

1    Lastly, defendants argued that plaintiff's employment was not renewed because he was an

2    ineffective leader.  This explanation for terminating his employment as an anesthesiologists is

3    dubious.  When plaintiff was hired at the VA in March 2007, the anesthesia department did not

4    have a Chief of Anesthesia.  Six months later, the VA had still not been able to hire someone to

5    fill the position, and no other members of the anesthesia department wanted the challenge.

6    Plaintiff, however, volunteered to take on the role—perhaps naively.  There is no doubt that the

7    anesthesia department continued to experience multiple issues during plaintiff's first year as

8    Chief.  This fact is evident from the April 24, 2008, and September 10, 2008 letters in which the

9    other members of the anesthesia group voiced their concerns to plaintiff.  *See* Defs.' Exs. B, C.

10   Defendants rely on the two letters and a failure to inventory Pyxis machines, which are

11   medication dispensing machines.

12    As for the Pyxis machines, each operating room contained one machine which was

13   required to be inventoried weekly by the anesthesia department.[20]  As this task was not being

14   performed by his group, plaintiff took on the responsibility to personally conduct the weekly

15   inventory.  There was considerable dispute at trial over whether the Pyxis machines were being

16   properly inventoried during the time plaintiff was Chief.  Kelly Moore, the VA Northern

17   California Health Care System Compliance Officer, testified that the anesthesia department was

18   not conducting the weekly inventories.[21]  She further stated that she brought the issue to

19   plaintiff's attention and attempted to obtain inventory logs, but no inventory logs were ever

20   produced.  Dr. Cahill and Dr. Hundahl also testified that there were issues with the machines not

21   being properly inventoried.  Dr. Cahill specifically testified that the problem with the Pyxis

22   inventories was one of the considerations in the decision to terminate plaintiff's employment.

23   Plaintiff, however, testified that while the machines may not have been inventoried on the same

24   day each week, the weekly inventories were generally being performed.

25   /////

26   ───────────────────────
      [20]  This was in addition to the daily inventories conducted by pharmacy personnel.

27
      [21]  Ms. Moore was hired by the VA to implement a controlled substance inspection
28   program.  This program required, among other things, weekly inventory of the Pryxis machine.

1    The court finds plaintiff's testimony on this issue credible.  Although Dr. Cahill testified

2    at the trial that the Pyxis inventories were not being conducted, the court finds the contrary

3    version Dr. Cahill provided in his September 5, 2012 deposition testimony more credible.  Dr.

4    Cahill testified in his deposition that the inventories were generally being completed.  Of

5    particular significance, he explained that the anesthesia group was not always getting credit

6    because the inventories were sometimes being completed a day or two behind the day the

7    monitoring group expected the inventory to be completed.  He also stated that in his "mind, if

8    [plaintiff] is doing it every week on Wednesday, and the monitor is expecting it every week on

9    Tuesday, the issue  - - you know, if the issues is doing it weekly, [plaintiff is] doing it weekly."

10   He further stated that aside from two gaps (one 12 days and the other 10 days) the inventories

11   were regularly being conducted, and that "this is considerably better than data I've seen from

12   parts of our hospital where we know we're missing."  This testimony discredits the assertion that

13   plaintiff was fired because he was not doing his job as it relates to the Pyxis inventories.  Indeed,

14   Dr. Cahill's deposition testimony corroborates plaintiff's testimony at trial and the court finds that

15   plaintiff was generally completing the weekly Pyxis inventories even if, as Dr. Cahill explained, it

16   was completed on Wednesdays and the monitor was expecting it on Tuesdays.

17   Defendants' reliance on the two letters from the anesthesia group is also unconvincing.

18   The letters were dated April 24 and September 10, 2008, respectively.   Defs.' Exs. B and C.

19   Plaintiff testified that he met with Dr. Hundahl after he received the letters to discuss the issues

20   raised.  Significantly, plaintiff had not yet left for extended leave to have his surgery.  According

21   to plaintiff, Dr. Hundahl did not seem overly concerned by the issued raised in the letters.  While

22   defendant disputes this, Dr. Hundahl's written appraisals of plaintiff's performance during this

23   period of time is revealing on this point.

24   Plaintiff received three performance evaluations during his tenure with the VA.  The first

25   evaluation covered plaintiff's job performance from March 18, 2007, his first day with the VA,

26   through September 30, 2007, the last day of the fiscal year.  Pl.'s Ex. 2.  The evaluation covered

27   five categories with each scored by five rating options (unsatisfactory, low satisfactory,

28   satisfactory, high satisfactory, and outstanding).  Plaintiff was rated as outstanding in three

1   categories and high satisfactory in two categories, with an overall rating of outstanding. *Id.* The

2   rating official for the evaluation was Dr. Hundahl, and his rating was approved by Dr. David

3   Siegel, the then Acting Chief of Staff. *Id.*

4   Plaintiff's received a second performance evaluation, this one covering his performance

5   between March 18, 2007, and September 30, 2008, the time frame in which the two letters were

6   received. Pl.'s Ex. 54. This form again rated plaintiff's performance in five different categories,

7   but with only three rating options available for each category (exceptional, fully successful, and

8   less than fully successful). The overall rating level, however, had five rating options

9   (outstanding, excellent, fully successful, minimally satisfactory, unsatisfactory). Plaintiff

10  received a rating of fully successful in four categories and an exceptional in the remaining

11  category. Despite the concerns raised by the members of the anesthesia department, plaintiff's

12  overall rating was fully successful.[22] Dr. Hundahl was the rating official that completed the form,

13  and Dr. Cahill approved the rating.

14  The third and final performance evaluation covered plaintiff's performance from October

15  1, 2008 to September 30, 2009, the time period during which plaintiff took FMLA leave.[23] Joint

16  Ex. J-5. Plaintiff again received ratings of fully successful in four out of five categories, but this

17  time he was rated as being less than fully successful in the category entitled "HDPM Additional

18  Core Competencies," a category plaintiff was previously rated as fully successful. This category

19  evaluated technical competence, creative thinking, flexibility/adaptability and personal mastery.

20  *Id.* at 4. The narrative explaining the basis for the rating of "less than fully successful" provided

21  that plaintiff had experienced issues with other members of his group and that although

22  "anesthesiology resources have on occasion been limited, he has not managed and de-conflicted

23  leave requests well or maximized the resources available; this resulted in some excess use of

24  (expensive) fee-basis anesthesiology provides." *Id.* at 4-5. Plaintiff's overall rating was

25  [22] While it can be argued that fully successful is less than the ideal, the ratings hardly
26  suggest an impending decision to fire an anesthesiologist for poor performance or that poor
    performance and not the extended absence on leave to have surgery accounts for the decision at
27  issue here.

28  [23] The second and third evaluations utilized the same evaluation form.

1   minimally satisfactory.  *Id*. at 2.  Dr. Hundahl was again the rating official for this review, with

2   Dr. Cahill as the approval officer.  *Id*. at 3.

3       In addition to performance evaluations, plaintiff also received performance pay (i.e.,

4   bonuses) during his tenure at the VA.  For the period of March 2007 through September 2008,

5   plaintiff was awarded $10,787 in performance pay, which was 90 percent of the maximum

6   $13,500 he could receive for his 7 months of work.  Joint Ex. J-15.  For the period of October

7   2007 through September 2008, plaintiff was awarded $15,000, the maximum allowed.  Joint Ex.

8   J-16.  However, for the period of October 2008 through September 2009, plaintiff only received

9   $8,250.10 in performance pay.  Joint Ex. J-17.  Dr. Hundahl was the recommending official on

10   each performance pay evaluation.

11       Taking this documentation in combination, the evidence shows that during the time period

12   in which the anesthesia department raised concerns about plaintiff's performance as Chief, Dr.

13   Hundahl rated plaintiff as fully successful and concluded that plaintiff was entitled to the

14   maximum amount of performance pay.  However, the rating which covered the time period

15   during which plaintiff took FMLA leave evaluated plaintiff as minimally satisfactory and plaintiff

16   received a reduced performance pay amount.  The question posed is why, in light of the FMLA

17   protection of the leave plaintiff took.  The letters simply do not answer that question.  Hundahl

18   renewed plaintiff's contract for an additional year on March 18, 2009, many months after the two

19   letters were written in 2008.  It strains credulity to suggest, in hindsight, that the letters motivated

20   the decision not to renew plaintiff's employment.

21       Further undermining defendants' explanation is the fact that plaintiff was no longer Chief

22   at the time that his employment was terminated.  He submitted his resignation of the Chief duties

23   and his request to remain as a staff anesthesiologist on December 1, 2009, a request that Dr.

24   Hundahl granted.  At the time the request was granted, there was a vacant staff anesthesiologist

25   position.  If, as the defense concedes, Dr. Bonzani was a qualified and competent

26   anesthesiologist, Dr. Hundahl could have retained plaintiff as a staff anesthesiologist and still

27   maintain the ability to recruit and hire a new Chief of Anesthesiology.  Regardless of leadership

28   concerns, there certainly was a need for retaining a staff anesthesiologist.

1    Indeed, the need at the Sacramento VA was pronounced.  Although it was approved for

2    six anesthesiologists, it often experienced difficulty recruiting and maintaining six to fill these

3    positions.  The shortage of anesthesiologists was explained quite pointedly by Dr. Baker.  Dr.

4    Baker was so concerned about keeping an adequate number of anesthesiologists that he circulated

5    a petition to retain plaintiff.  The petition was signed by 31 individuals, including three

6    anesthesiologists.  Pl.'s Ex. 8.  The two members of the anesthesia department that did not sign

7    the form were Dr. Batista and Dr. Donald.  Dr. Donald testified that she declined to sign the

8    petition, not because she thought plaintiff's employment should have been terminated, but

9    because she was concerned with the repercussions she would potentially face for signing it.  Dr.

10   Donald stated that she believed plaintiff to be a good anesthesiologist.  Dr. Batista testified that

11   she no longer wanted to work with plaintiff, but confirmed that he was a competent

12   anesthesiologist.

13   Thus, whatever can be said of plaintiff's short tenure as Chief, there was a historical and

14   recurrent difficulty of obtaining and keeping anesthesiologists.  The result was scheduling

15   conflicts and surgeries being cancelled, before, during and after plaintiff's tenure as Chief, but

16   most severely during plaintiffs extended absence on FMLA leave.  In spite of the need for

17   anesthesiologists, plaintiff's employment contract was not renewed.  Further, it was not renewed

18   in spite of an available staff position and defendants' concession that plaintiff was a competent

19   anesthesiologist.[24]  Accordingly, it is difficult to comprehend how any shortcomings plaintiff

20   displayed as a chief supported the decision to end his employment as an anesthesiologist.

21   /////

22

23   [24]  Defendants argue that the issue is the non-renewal of plaintiff's employment as chief,
     not his employment as a staff anesthesiologist.  There was some testimony at trial indicating that

24   the formal paperwork needed to transfer plaintiff from his chief position to a staff anesthesiology
     position was never processed, which defendants relied upon to argue that on paper he was chief at

25   the time his employment ended.  The failure to process the paperwork does not alter the reality in
     the workplace.  Dr. Hundahl accepted plaintiff's resignation as chief and granted the request to

26   stay on as a staff anesthesiologist.  Joint Ex. J-2.  Dr. Hundahl directed Carol Ross to ensure
     plaintiff was converted to a staff anesthesiologist position.  Pl.'s Ex. 26.  Any technical error in

27   processing the paperwork does not undermine the fact that plaintiff was working as a staff

28   anesthesiologist at the time his employment ended.

22

1    Lastly, plaintiff specifically testified that at the January 6, 2010 meeting Dr. Hundahl

2   stated to him: "you're good when you're here, but you were gone too long.  You take too much

3   sick leave.  We can't do surgeries without fucking anesthesiologists."  Although Dr. Hundahl

4   disputes making this statement, the court finds plaintiff to be more credible and therefore gives

5   greater weight to his version of the January 6 meeting.[25]

6    Based on the foregoing, the court finds from a preponderance of the evidence that

7   plaintiff's taking of leave to have surgery, leave that is protected by the FMLA, was the primary

8   basis for not renewing his employment contract with the VA.  Accordingly, the Secretary

9   interfered with plaintiff's rights under the FMLA.

10    B.    FMLA Claim Against Defendant Hundahl

11    The court ruled on a pretrial motion that plaintiff could proceed on a claim under the

12   FMLA against Dr. Hundahl in his individual capacity.  *Bonzani v. Shinseki,* 895 F. Supp. 2d

13   1003, 1010 (E.D. Cal. 2012).  As noted above, plaintiff's FMLA claim against Dr. Hundahl--

14   although predicated on essentially the same facts as addressed above--was tried to the court.

15   However, one element of the claim, the factual question of whether Dr. Hundahl acted as an

16   "employer" for purposes of the FMLA was tried to the court.[26]  If Dr. Hundahl did in fact act as

17   an employer for purposes of the statute, the remaining factual issues were for the jury to resolve.

18   The question of Hundahl's status involves a pragmatic determination of the extent to which he

19   controlled the decision to end plaintiff's employment.  That turns on facts intertwined with the

20   merits of the jury issues and therefore the trial proceeded as a hybrid bench and jury trial.  In

---

21    [25]  Other items of evidence raised concerns over Hundahl's candor as to this issue.  For
22   example, his email dated January 12, 2010, responding to Dr. Baker's petition and concern over
     plaintiff losing his job, states: "before making up your mind, you might want to get some of the
23   facts.  You were absent for much of Dr. B's problematic period.  You are unaware of the two
     adverse letters to him signed by all the other anesthesiologist."  Pl.'s Ex. 106.  As noted, prior to
24   Bonzani's absence for surgery, Dr. Hundahl gave plaintiff a favorable review and found that he
     was entitled to the maximum performance pay subsequent to receipt of these letters.  More
25   significantly, he extended plaintiff's employment contract for an additional year on March 18,
26   2009.

27    [26]  Both parties waived jury on the issue of whether defendant Hundahl was an
     "employer" for purposes of the FMLA and requested that the issue be tried to the court.  ECF No.
28   118 at 16; *see* Fed. R. Civ. P. 39(a).

1    addition to the factual findings above, which are incorporated herein, the court now enters

2    findings of fact and conclusions of law as to the issue of whether Hundahl acted as an employer

3    for purposes of the FMLA, 29 U.S.C. § 2617(a).

4                    1.  Dr. Hundahl's Status as an Employer Under the FMLA

5            The court applies a four-factor "economic reality" test to determine whether an individual

6    is an employer under the FLSA.[27]  In the Ninth Circuit that test considers: "Whether the alleged

7    employer (1) had the power to hire and fire the employees, (2) supervised and controlled

8    employee work schedules or conditions of employment, (3) determined the rate and method of

9    payment, and (4) maintained employment records."  *Lambert v. Ackerley*, 180 F.3d 997, 1001–02,

10   2012 (9th Cir. 1999).  Thus, an individual officer, director, or supervisor may be held liable as an

11   employer under the FLSA where the evidence supports a determination that the individual

12   exercised economic and operational control over the employment relationship.  *Id.* at 1012 (CEO

13   and COO properly deemed employers under the FLSA where they had a significant ownership

14   interest as well as operational control of significant aspects of the company's day-to-day

15   functions, the power to hire and fire employees, the power to determine salaries, and

16   responsibility for maintaining employment records); *Boucher v. Shaw*, 572 F.3d 1087, 1091 (9th

17   Cir. 2009) (finding that a defendant responsible for handling labor and employment matters, who

18   also held 30% ownership over a company, was an "employer" under the FLSA); *Biggs v. Wilson*,

19   1 F.3d 1537, 1538 (9th Cir. 1993) (finding that a state's failure to issue state employees'

20   paychecks until after a state budget was passed by the legislature and signed by the Governor

21   demonstrated the "economic reality" of being a state employee, and was therefore a violation of

22   the FLSA); *Chao v. Hotel Oasis, Inc.*, 493 F.3d 26, 34 (1st Cir. 2007) (corporation's president

23   personally liable where he had ultimate control over business' day-to-day operations and was the

24   corporate officer principally in charge of directing employment practices); *Ulin v. ALAEA–72,*

25   _____

26        [27]  In deciding defendants' prior motions to dismiss the complaint and for summary
     judgment, the court relied on the similarity between the FMLA's and the FLSA's definition of
27   employer in holding that a supervisory can be held liable under the FMLA.  *Bonzani v. Shinseki*
     895 F. Supp. 2d at 1009-10. The court therefore employs the standard utilized under the FLSA to
28   determine whether Dr. Hundahl had sufficient control to be an employer under the FMLA.

*Inc.*, 2011 WL 723617, at *11 (N.D. Cal. Feb. 23, 2011) (finding an individual personally liable as an employer under the FLSA when the individual "was responsible for posting, calculating, measuring, estimating, recording, or otherwise determining the hours worked by Plaintiff, and wages paid him," and "authorized and issued payments to Plaintiff, supervised Plaintiff's work, and was responsible for recruiting, hiring, firing, disciplining, assigning jobs and setting wages for Plaintiff"); *Solis v. Best Miracle*, 709 F. Supp. 2d 843, 847 (E.D. Cal. 2010) (finding that a manager who had the authority to hire and fire employees, instructed employees to falsify their time cards, maintained employment records, filled out time and wage sheets, signed paychecks, and "paid all the bills" was an "employer" under the FLSA).

Dr. Hundahl maintains that he did not act as an "employer" for purposes of the FMLA because he lacked sufficient control over plaintiff's employment. As discussed below, however, Dr. Hundahl himself has expressed conflicting views on this question. Central to his position at trial is his contention that he only had the authority to make recommendations—as opposed to a final decision—regarding changes to plaintiff's employment. He testified that the Chief of Staff must then concur in the recommendation, which is then submitted to the Chief of Human Resources for a final decision. Although other defense witnesses supported this assertion of how the decision should have been made, it does not accurately state what, in fact, occurred in deciding to terminate Dr. Bonzani's employment.

It may well be the case that Dr. Hundahl's role in theory was supposed to be one of making a recommendation, but the four-factor "economic reality" test looks to what actually occurred. In turn, this test requires the court to determine who actually controlled the choice of whether to keep or terminate plaintiff as an anesthesiologist.[28] The court finds by a

---

[28] As with the FLSA, the focus under this test is on who actually controlled the conditions regulated by the statute. *See, e.g., Lambert v. Ackerley*, 180 F.3d at 1012 (focusing on whether the defendant exercised operational control); *Chao v. Hotel Oasis, Inc.*, 493 F.3d at 34 (focusing on control of day-to-day operations); *Ulin v. ALAEA–72, Inc.*, 2011 WL 723617, at *11 (focusing on control over recruiting, hiring, firing, disciplining, assigning jobs, determining hours worked and setting wages). Whereas the FLSA regulates, among other things, wage and hours, the FMLA prohibits making the use of protected leave a negative factor in an employee's continued employment. Thus, the concern here is who, in fact, controlled whether Dr. Bonzani should be disciplined and/or terminated for his use of leave.

1   preponderance of the evidence that Dr. Hundahl, in fact, controlled that choice.  Indeed, his

2   decision surprised Dr. O'Neill, the Director of Health Care System and Dr. Cahill's supervisor,

3   who had virtually no role in analyzing or deciding the matter other than to state that all he cared

4   about was not ending up in a costly lawsuit.

5        At trial, Dr. Hundahl characterized his role as merely making a recommendation.  This

6   stands in stark contrast to the announcement in his email to Drs. Cahill and O'Neill of his

7   decision not to renew the employment contract.  Dr. Hundahl was confronted at trial with his

8   earlier deposition testimony in which he was asked in open ended fashion "[w]ho decided to

9   extend Dr. Bonzani's appointment?"  Dr. Hundahl succinctly replied "[i]t would have been me."

10  Only when pressed on whether he was the only person to make that decision did he then re-

11  characterize the decision as a recommendation.  ECF No. 185 at 15.  But re-labelling the choice

12  as a recommendation for purposes of deflecting responsibility does not alter the reality of what

13  occurred.  Dr. Hundahl informed Drs. Cahill and O'Neill that he, Hundahl, would not be

14  renewing plaintiff's employment.  Lest there be any doubt as to who was making the decision, Dr.

15  O'Neill asked whether that meant plaintiff was losing his job.  That is a response indicative of the

16  practical finality of Hundahl's choice, not a response that the choice was being treated as a

17  recommendation that would be considered and either accepted or rejected.  Although Dr. O'Neill

18  counseled caution to avoid litigation, he did not treat the decision as a recommendation.[29]  There

19  was no evidence presented that any official other than Hundahl actually controlled the decision-

20  making process and ultimate choice whether to end plaintiff's employment.  It was Hundahl who

21  took account of plaintiff's performance, approved or disapproved his absence from work,

22  analyzed whether to keep him as a staff anesthesiologist, and more importantly, actually exercised

23  control over the choice to be made.  In light of his overall demeanor and manner of testifying and

---

25   [29]  If their management communications can in any way be taken seriously, there is simply
26  no other way to interpret the email correspondence in which Hundahl stated "As you know, I will
    not be renewing Dr. Bonzani's 1 year NTE contract (expiring in March, 2010)" and O'Neill
27  responded "What does it mean that you won't be renewing Bonzani's 1 year contract?  You mean
    he is losing his job."  Pl.'s Ex. 102.

28

1     taken in the context of all the other evidence, the court cannot credit the attempt to explain away

2     Hundahl's responsibility for the decision that he made.  In short, if plaintiff's use of protected

3     leave motivated or otherwise was used as a negative factor in the decision to end plaintiff's

4     employment, the choice to terminate his employment was that of Dr. Hundahl.

5         Dr. Hundahl also exercised operational control more generally.  There were other

6     instances in Dr. Hundahl's testimony in which he unguardedly described decisions that he plainly

7     controlled.  For example, Hundahl testified that he made the earlier decision to extend plaintiff's

8     employment for one year.  After catching his misstep, his demeanor changed and he qualified his

9     characterization of the decision as a recommendation.  When cross-examined about the August 26

10    AWOL, Dr. Hundahl stated "I could have fired him (referring to plaintiff) after that first AWOL.

11    I did not."  Significantly, Dr. Hundahl testified that although he discussed with HR personnel

12    whether to immediately terminate plaintiff's employment after the AWOL, he specifically "made

13    a decision to retain him, and [he] thought that was a fair decision."[30]  While the decision may or

14    may not have been fair, the issue at this point is who controlled the decision.  The court finds

15    from all of the evidence and testimony that it was Dr. Hundahl who controlled and actually made

16    the decision.

17        Dr. Hundahl's pretrial view of his role as the person making such decisions was shared by

18    others.  Dr. Baker explained that he provided Dr. Hundahl a copy of the petition to keep plaintiff

19

---

20       [30]  The testimony was as follows:

21

22         Q: So if an AWOL is a severe infraction, why would you
          have let him work out the remainder of his contract?

23         A: I could have fired him after that first AWOL. I did
          not.

24

25         Q: Did you even think about it?

26         A: Our HR staff discussed that with me.  *I made a
          decision to retain him*, and *I thought that was a fair

27         decision*.

28    ECF No. 186 at 70 (emphasis added).

1   because he believed Hundahl was the person with the power to hire and fire employees. While

2   the perception of other doctors in the surgery department is not dispositive on this issue, the fact

3   that others shared Dr. Hundahl's perception of his own authority at the time he terminated

4   plaintiff supports the finding that, notwithstanding a theoretical mechanism for how termination

5   decisions would be made, the practice in reality is that Dr. Hundahl made the decision to end Dr.

6   Bonzani's employment with the VA.

7        In making this finding the court has weighed carefully the testimony as to what apparently

8   was supposed to occur with other testimony as to what really happened. That testimony, together

9   with the clear contemporaneous email documentation of Hundahl's decision, shows that in reality

10  Hundahl made the decision. Again, the test focuses on the reality of what in fact occurred, not a

11  theoretical procedure that was not actually followed. When questioned at trial about Hundahl

12  informing them of his decision, Drs. Cahill and O'Neill each attempted to mitigate the effect of

13  the September 29 email by adding that everyone understood that Dr. Hundahl was simply making

14  a preliminary recommendation.[31]  While that post hoc characterization of the process may

15  describe how it was supposed to operate, it is not what occurred here. Considering Hundahl's

16  plain language used contemporaneously with his statement of the decision itself in his email

17  informing Cahill and O'Neill, his other testimony and the demeanor and manner of his testimony,

18  and in light of the testimony of the other witnesses, the court finds Dr. Hundahl's disclaimer at

19  trial--denying that he made the actual decision--is not credible. Hundahl's pretrial statements

20  clearly indicated that he was the individual who decided to terminate plaintiff's employment.

21        The court finds by a preponderance of the evidence that while the decision not to renew

22  plaintiff's employment may have been followed by paperwork through Human Resources to

23  implement Hundahl's decision, in practice the actual control over whether to terminate plaintiff's

24  employment was exercised by Dr. Hundahl.

25        Hundahl also exercised authority over plaintiff's work schedule. Any request for leave

26  had to be submitted through VistA for Dr. Hundahl's approval. Although the official leave

27

28        [31]  The attempt at trial by these defense witnesses to retreat from the damaging effect of
    the September 29 email correspondence simply diminished their credibility on this point.

1   calendar was originally maintained in Dr. Bonzani's office, Dr. Hundahl had it moved to his

2   office.  *See* Pl.'s Ex. 95.  Moreover, approval from Dr. Hundahl was needed before any cases

3   could be cancelled due to any staffing issue.  Thus, despite plaintiff being the Chief of

4   Anesthesiology, Dr. Hundahl exercised authority over his work schedule.

5          Although Hundahl did not have the authority to set plaintiff's base salary (salaries for

6   doctors and nurses were set by a professional standards board), to the extent anyone could

7   exercise control over plaintiff's compensation apart from the base salary, it was Hundahl.  As

8   noted above, Dr. Hundahl controlled the decision as to the amount of performance pay plaintiff

9   would receive each year.  Again, while Dr. Hundahl maintained at trial that he only made

10  recommendations regarding plaintiff's performance pay, the court finds, contrary to that

11  testimony, Dr. Hundahl actually controlled the decision.[32]

12         Little, if any, evidence was presented as to whether Dr. Hundahl was responsible for

13  maintaining employment records.  Nevertheless, assuming he was not, the court finds from a

14  preponderance of the evidence that on balance the several factors articulated in *Lambert*

15  demonstrate that Dr. Hundahl maintained sufficient control over the day-to-day operations of

16  plaintiff's employment to be considered an "employer" for purposes of liability under FMLA.

17         2.      The Jury's Verdict on The FMLA Claim Against Hundahl

18         Having resolved the issue of "employer" status under the FMLA, the court turns to the

19  jury's finding in favor of plaintiff as to the claim against Hundahl.  The parties do not dispute that

20  plaintiff was entitled to the leave that he took and that doing so was protected by the FMLA.

21  They agreed that the issues for the jury were whether Dr. Hundahl used plaintiff's protected leave

22  as a negative factor in not renewing his employment and, if so, the question of damages.[33]  The

23  jury returned a verdict finding that plaintiff had proven by a preponderance of the evidence that

24  _____

25         [32]  No evidence or examples were presented showing that Hundahl's determinations in
    that regard were, in practice, limited by a higher level of review.  Rather, it appears from the
26  evidence that these decisions were simply implemented without further analysis or weighing of
    the various factors that would be considered in making those decisions.

27         [33]  However, the defendants' dispute whether the loss of pension benefits is an item of
28  damages rather than a question of equitable relief.

1   defendant Hundahl used plaintiff's medical leave as a negative factor in the decision not to renew

2   plaintiff's appointment.  ECF No. 178.  The jury further found that Hundahl failed to prove that

3   he would have taken the same action even if he had not considered plaintiff's medical leave.  *Id*.

4   The jury also found that plaintiff sustained damages in the amount of $675,238 based on Dr.

5   Hundahl's interference with plaintiff's use of FMLA leave.  *Id*.

6        Hundahl argues that any award for the loss of FERS benefits should be characterized as

7   front pay, as opposed to back pay, and therefore the determination as to any loss is an issue that

8   must be decided by the court.

9           3.    Front Pay vs. Back Pay[34]

10        Hundahl characterizes the jury's award of $675,238 in damages as front pay and argues it

11   must be vacated because front pay must be determined by the court, not the jury.  Secondly,

12   Hundahl argues that an award of front pay is unduly speculative and would result in an

13   impermissible windfall to plaintiff.  Neither argument has merit.

14        "An employer who violates the [FMLA] is liable for damages equal to the amount of any

15   lost wages and other employment-related compensation, as well as any actual damages sustained

16   as a result of the violation. . . ."  *Bachelder v. America West Airline, Inc.*, 259 F.3d 1112, 1130

17   (9th Cir. 2001).  A plaintiff may recover damages in the form of back pay and front pay for an

18   interference claim under the FMLA.  *See* 28 U.S.C. §§ 2617; *Traxler v. Multnomah County*, 596

19   F.3d 1007, 1011-1012 (9th Cir. 2010).  The back pay provision of the FMLA authorizes damages

20   equal to "wages, salary, employment benefits, or other compensation denied or lost . . . by reason

21   of the violation. . . ."  29 U.S.C. § 2617(a)(1)(A)(i).  Back pay should generally be computed

22   "from the date of the discriminatory act until the date of final judgment."  *Thorne v. City of El*

23   *Segundo*, 802 F.2d 1131, 1136 (9th Cir. 1986).

24        "In cases in which reinstatement is not viable . . . courts have ordered front pay as a

25   substitute for reinstatement."  *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846

26   (2001).  In the court's discretion it can be awarded in cases where an appropriate position is not

27

28          [34]  The discussion and findings in this section that relate to the determination of plaintiff's loss applies to the FMLA claim against the Secretary as well as Hundahl.

1    immediately available without displacing an incumbent, or continuing hostility or irreconcilable

2    breakdown of working relationships renders the remedy of reinstatement non-viable.  *Id.*  But

3    front pay is only appropriate where the court determines that reinstatement is inappropriate, such

4    as when "the employer-employee relationship has been so damaged by animosity that

5    reinstatement is impractical."  *Traxler*, 596 F.3d at 1012.  "In other words, a front pay . . . award

6    is the monetary equivalent of the equitable remedy of reinstatement."  *Id*. (quotations omitted).

7           Here, plaintiff does not seek reinstatement.  Nor does he seek an award for the loss of

8    future salary in lieu of reinstatement.  He seeks compensation for the monetary loss of pension

9    benefits for which he otherwise would have vested had he been allowed to continue working two

10   more years until vesting in the FERS retirement plan.  In summary, his expert witness calculated

11   the present day value of FERS benefits he otherwise would have been entitled to receive had he

12   completed those two years of federal service and then left for the private sector.  As discussed

13   below, there was an evidentiary basis for the jury to credit plaintiff's testimony that he would

14   have done so, and to further credit his expert's testimony that had plaintiff done so--and become

15   vested in FERS--the present value of the benefits he would have received is $675,238.  The point

16   missed by Hundahl is that had plaintiff been allowed to work the two additional years he would

17   have vested as of a date before the trial, not some date in the future.[35]  In short, reinstatement is

18   not an issue and neither is the question of front pay.

19          Neither is there merit to defendant's argument that courts routinely categorize such

20   damages as front pay.  The question is not settled.  Defendant Hundahl cites to *Miller v. Raytheon*

21   *Co.*, 716 F.3d 138, 146-147 (5th Cir. 2013), a case which addressed the award of enhanced

22   benefits that would have vested at age 55.  The plaintiff therein attained age 55 a few months

23

24          [35]  Had plaintiff's employment not been terminated, his FERS benefits would have vested
     in March 2012, prior to this case going to trial.  A back pay award that includes associated
25   compensation that otherwise would have been received (such as service credits and contributions)
     is retrospective, not prospective.  Although plaintiff does not ask for back pay, he does seek
26   compensation for the value of the back benefits that would have accrued.  Calculating the value of
     the loss of vesting in the pension based on credited service through March 2012, adjusted to its
27   present day value, does not convert it into a monetary award in lieu of reinstatement.  It is
     calculation of the same value he would receive with no order for reinstatement.
28

before trial.  The Fifth Circuit viewed the question of whether the plaintiff would have stayed

with the company until age 55 to qualify for the enhancement as a forward-looking determination

and characterized the award as front pay, thus disqualifying it from consideration in determining

any liquidated damages award.  *Id* at 146.  But the court in *Miller* expressly cautioned:

> As we did in *Bourdais* [*v. New Orleans City,* 485 F.3d 294]*,* at 301
> n. 9., we decline to set out an inflexible rule on the treatment
> of "pension benefits" as damages or front pay under ADEA. The term
> is ambiguous.  In some cases, it refers to employer contributions to
> a 401(k) plan; in others, to the right to receive certain benefits in the
> future; in others, the accrual of seniority entitlements to enhanced
> payments. *Compare e.g., Sharkey v. Lasmo (AUL Ltd.)*, 214 F.3d
> 371, 374–75 (2d Cir. 2000) ("pension credits" in form of "service
> and salary credits" coextensive with back pay award should be
> treated as back pay).

716 F.3d at 147, n.3.  *Bourdais* states that "[w]hether a plaintiff's delayed accumulation of

pension benefits should be considered back pay or front pay appears to be an unresolved issue in

this Circuit."[36]  The court noted that neither party briefed the issue and it was therefore waived.

Thus, the panel concluded "[w]e do not disrupt the district court's classification of this award as

front pay but note that the issue remains undecided."  In contrast, the Second Circuit case cited in

*Miller, Sharkey v. Lasmo (AUL Ltd.)*, states "[w]e agree with Sharkey that awards for lost pension

benefits are compensation for past economic loss—not a form of 'prospective relief,' as the

district court found."  214 F.3d at 374-75.  Sharkey argued that he was entitled to service and

salary credits for the same period as the jury awarded back pay.  The Second Circuit agreed.  It

distinguished two kinds of relief that may be awarded to compensate a prevailing plaintiff for lost

---

[36]  Defendant Hundahl's other cited authorities fail to support the broad proposition he argues here.  *Skalka v. Fernalk Envtl. Restoration Mgt. Corp.*, 178 F.3d 414, 425 (6th Cir. 1999), cited by defendant provides little assistance.  As the court stated, the plaintiffs therein did not attempt to defend the inclusion of the pension benefits in the back pay award and there is no analysis as to whether plaintiff would have vested during the time period plaintiff was eligible for back pay compensation.  *Blum v. Witco Chem. Corp.*, 829 F.2d 367, 370 (3d Cir. 1987), also cited by plaintiff does not analyze the question here but simply answers the different question of whether benefits could be awarded as front pay.  Likewise, *Graefenhain v. Pabst Brewing Co.* did not decide the question raised here but simply affirmed a denial of front pay.  *See* 870 F.2d 1198, 1212 (7th Cir. 1989)  ("If, before trial, he received benefits, in the form of severance pay or lump-sum pension payments, which more than offset his loss of future earnings, he suffered no economic injury from his discharge.").

pension benefits.  "First, the plaintiff's lost service and salary credits may be restored to his

pension plan."[37]  *Id.* at 375 (citing *Banks v. Travelers Cos*., 180 F.3d 358, 365 (2d Cir. 1999) and

*Geller v. Markham*, 635 F.2d 1027, 1036 (2d Cir. 1980)).  The court added that:

> This is the post-trial, equitable relief that Sharkey seeks.  However,
> as we recognized in *Banks*, it is also possible to award money
> damages to compensate the plaintiff *for the value of the pension
> benefits that were lost*. This form of legal relief is proper for a jury
> to award. *See Banks*, 180 F.3d at 365 ("Had [plaintiff] actually
> requested money damages for lost pension benefits, the district
> court might well have been right to deem that form of relief legal
> . . . .").

214 F.3d at 375 (emphasis added).  This is precisely the form of money damages sought by

Bonzani and awarded by the jury here.

     Here, the jury necessarily credited plaintiff's testimony that he would have remained with

the VA at least through March 2012 before leaving for the private sector had Hundahl not

terminated plaintiff's employment earlier.[38]  It also expressly found that the defendant had not

established that he would have taken the same action without using plaintiff's medical leave as a

negative factor in the termination decision.  ECF No. 178.  This trial commenced October 20,

2015, and the jury returned its verdict in favor of plaintiff on the FMLA claim on October 30,

2015.  The jury's award to plaintiff of damages for the value of the pension benefits lost does not

require a monetary award of additional future salary and pension contributions for some number

of years as an equivalent of the equitable remedy of reinstatement.  Rather, the jury credited the

testimony of plaintiff's expert, Mr. Davis, and awarded the money damages for the lost pension

benefits, reduced to present value, that plaintiff would have been entitled to had he not been

---

[37]  Defendant concedes that this is one possible remedy.  ECF No. 182 at 6 ("At most, back pay might consist of FERS contributions that the VA would have made into his retirement account had he stayed at the VA long enough to vest in FERS [less plaintiff's share of required contributions].")

[38]  This was simply a matter of the jury determining whether it is credible that Dr. Bonzani, but for Hundahl's action, would have remained with the VA the two additional years to vest and then go on to private practice.  It concluded that it is.  Having so decided, and having credited Mr. Davis by adopting his damage figure of $675,238, the loss calculation was rather straight forward using the two additional years Bonzani would have worked at the VA.

1  terminated prior to March of 2012.  Thus, the award simply credits plaintiff for the two years of

2  *past service* and salary credits through that date and compensates him for the lost value.

3           Even if defendant were correct that the question should have been decided by the court

4  under a front pay analysis rather than awarded as damages by the jury, plaintiff's loss would

5  nonetheless be compensable.  As previously noted, front pay is only available where

6  reinstatement is not viable.  *Traxler*, 596 F.3d at 1012; *see also Gotthardt v. National R.R.*

7  *Passenger Corp*, 191 F.3d 1148, 1156 (9th Cir. 1999) ("[R]einstatement, when it is feasible, is

8  the preferred remedy in a discrimination suit.").  Here, reinstatement is not feasible.  Plaintiff

9  returned from his FMLA leave to a hostile work environment.  Soon after his return he was

10  confronted by Dr. Hundahl, who was either "raising his voice" or "yelling" and pounding his fist

11  about the problems the VA had experienced while plaintiff was out on leave.  Following

12  plaintiff's leave there was also a breakdown of any effective communication between them.  Dr.

13  Hundahl was plaintiff's supervisor and the lack of effective communication precluded

14  reinstatement as a realistic option.

15          Reinstatement as an anesthesiologist at another location in the Northern California VA

16  system is also not feasible.  Dr. Cahill specifically testified that after plaintiff was notified his

17  employment would not be renewed, other options for retaining him were explored, including

18  whether he could work at the VA in Martinez, California, but those options were not feasible.

19  Cahill Tr., ECF No. 192 at 4-7.  Accordingly, the court finds that reinstatement is not a viable

20  option and front pay could be considered as an alternative form of compensation, had it been

21  necessary.

22          Hundahl also argues that compensation for the pension loss inappropriate for the

23  additional reason that an award of FERS benefits is too speculative and is contrary to evidence at

24  trial.  ECF No. at 180 at 15.  He argues that it is speculative whether plaintiff would have

25  remained on staff at the VA for two additional years had his employment not been terminated,

26  despite plaintiff's testimony that he had every intention of doing so.  *Id.*  But "by its nature, a

27  front pay award requires a certain amount of speculation by the Court."  *Nehara v. California*,

28  2013 WL 1876122, at *4 (E.D. Cal. May 3, 2013) (citing *Traxler v. Multnomah Cnty.*, 596 F.3d

1    at 1011 and *Downey v. Strain*, 510 F.3d 534, 544 (5th Cir. 2007) ("Front pay can only be

2    calculated through intelligent guesswork, and we recognize its speculative character by according

3    wide latitude in its determination to the district courts.")).  Here, the crux of Hundahl's

4    "speculative" argument relates more to the credibility of Dr. Bonzani's testimony about his career

5    plans than the estimations and calculations that must be made assuming his testimony is credited.

6         As noted, plaintiff served in the Air Force from July 1, 1986, to February 12, 2007.  Upon

7    leaving the Air Force in 2007 he sought and obtained employment with the VA as an

8    anesthesiologist.  He credibly testified that one reason he sought employment with the VA was so

9    he could transfer over his military retirement into FERS.[39]  He also stated that he did not have a

10   plan for how long he intended to work at the VA, but he wanted to stay at least until his

11   retirement vested.  Although there was some evidence that plaintiff looked for other employment

12   opportunities in the private sector in 2008 and 2009, he clearly indicated in his December 1, 2009

13   letter to Dr. Hundahl that it was his "desire to serve the VA as a staff anesthesiologist . . . ."  Joint

14   Ex. J-1.  Thus, while Hundahl disparages plaintiff's testimony, the evidence supports Dr.

15   Bonzani's assertion that he wanted to remain employed as a staff anesthesiologist for at least two

16   additional one-year terms, thereby acquiring the requisite number of years to vest in FERS, and

17   that he would have done so had Dr. Hundahl not terminated his employment.  Like the jury, the

18   court finds credible plaintiff's testimony in that regard.

19        As did the jury, the court further finds that absent the decision by Dr. Hundahl to end Dr.

20   Bonzani's employment due to his use of protected leave, the VA otherwise would not have

21   unilaterally terminated plaintiff's employment.  Testimony at trial consistently established that

22   the VA experienced difficulty recruiting and maintaining anesthesiologists.[40]  That very staffing

23   problem prompted Dr. Baker to circulate the petition to retain plaintiff as a staff

24

25        [39]  The evidence presented at trial conclusively demonstrated that five total years of civil
26   service with the federal government was needed for plaintiff's interest in FERS to vest.

27        [40]  As noted, Hundahl does not dispute that plaintiff was a competent anesthesiologist.
     ECF No. 118 at 3.
28

anesthesiologist.[41]  The court was impressed with Dr. Baker's testimony, and in particular his

primary concern of being able to treat his patients who were in need of surgery.  Dr. Baker was

not friends with Dr. Bonzani (Baker Tr., ECF No. 191 at 9) and had no interest in the dispute at

issue in this case other than being able to provide treatment for his patients.  He made clear that

the petition was circulated *not* out of concern over plaintiff or Hundahl but instead out of a

concern for the mission of the VA to provide needed medical care to veterans.  He testified

pointedly and credibly that he drafted the petition because he needed competent anesthesiologists

to perform on his cases, and he had previously had problems with surgeries being canceled due to

insufficient staffing of anesthesiologists.[42]  Setting aside the rift that had developed between Dr.

Hundahl and plaintiff following plaintiff's extended absence for his knee surgery, there is every

reason to conclude that plaintiff would have worked at the VA as an anesthesiologist the two

additional years needed for his FERS benefits to vest.  *See Blum v. Witco Chemical Corp.*, 829

F.2d at 367 (finding reasonable the assumption that the plaintiff would have continued to work

for eight years until he reached retirement age).

Hundahl further argues that front pay is inappropriate because plaintiff had already fully

mitigated his damages.  ECF No. 180 at 16.  Defendant asserts that any loss of FERS vesting is

offset by plaintiff immediately finding employment at a substantially higher salary.  According to

defendant's calculation, his higher salary in non-government employment will outpace his

earnings and benefits that he would have received had he remained at the VA.  *Id*.  In short,

Hundahl argues that plaintiff sustained no loss because he was better off financially working in

the private sector than working at the VA.  The argument is premised on acceptance of

defendants' expert's opinion, and rejection of plaintiff's expert's opinion.  The jury rejected that

---

[41]  Dr. Baker's January 12, 2010 email to Dr. Hundahl informing him of the petition states: "Dr. Bonzani is a competent anesthesiologist, Mather is very short staffed on working anesthesiologist.  To let a Veteran, and good provider go does not make sense to any of the Surgeons or Nurses."  Pl.'s Ex. 105.

[42]  Dr. Baker testified: "I wanted an anesthesiologist that could put my patients together – to put my patients to sleep safely so that they could get their operations.  So if it's something about they [Drs. Hundahl and Bonzani] can't get along with each other or something else, it doesn't matter to me.  If he will do his job, I want him to be there."  Baker Tr., ECF No. 191 at 7.

1   argument and so does the court.

2          Defendants' expert, Richard Barnes, a forensic accountant, opined that plaintiff did not

3   sustain any financial damages as a result of leaving the VA because his earning capacity

4   increased working in the private sector.  Mr. Barnes compared the projected earnings plaintiff

5   would have received had he remained with the VA for his entire career, including the FERS

6   benefits he would have received upon retirement, with his projected earnings from working in the

7   private sector.

8          He testified that plaintiff was projected to earn between $50,000 to $60,000 more a year

9   working in the private sector, and that if plaintiff worked until he was 68 years old and lived to be

10  between 76 and 79,[43] plaintiff would still earn $200,000 to $400,000 more in the private sector

11  than had he remained at the VA.  Accordingly, it was his opinion that plaintiff did not sustain any

12  damages as a result of his employment not being renewed.

13         Mr. Barnes's projection disregards the alternative that plaintiff, instead of being fired,

14  would have remained in government service with the VA for the two additional years he needed

15  to combine with his military service in order to vest in a FERS pension before moving to the

16  private sector.  This point was addressed by plaintiff's expert, Conrad Davis, also a forensic

17  accountant.

18         Mr. Davis pointed out that plaintiff was let go from the VA two years before he vested.

19  Davis Tr., ECF No. 193 at 4.  Had plaintiff not been terminated, Mr. Davis projected what

20  plaintiff's VA earnings would have been for two additional years, and then calculated what his

21  FERS pension would have been had plaintiff been able to complete that service and vest in FERS

22  prior to leaving for the private sector.[44]  Mr. Davis concluded that plaintiff sustained a loss

23

24         [43]  Vocational expert witness Gary Nibbelink testified that plaintiff's work life expectancy
25  is 68.5 years and life expectancy is 78.4 years.  Plaintiff's expert witness determined that
    plaintiff's life expectancy was 76 years.

26         [44]  As discussed below, although Hundahl disputes this method as speculative, there
27  plainly is evidence to substantiate the assumption used that plaintiff would have continued
    working at the Mather VA facility for at least two more years.

28

1    equivalent to the value of the FERS benefits he would have received had he worked the two

2    additional years needed to vest, less any mitigation.  Mr. Davis ultimately concluded that the

3    discounted present value of plaintiff's FERS benefits totaled $657,238.[45]  This number was based

4    on the total amount of FERS benefits that, but for his termination two years before vesting,

5    plaintiff would have received from the time he reached age 60 through the date of his life

6    expectancy, minus monies he would have to pay to buy back military service credit to be eligible

7    for FERS[46] and mitigating earnings he received from employment in the private sector between

8    the date he left the VA and when his benefits would have vested.

9            Using this methodology was a major point of contention between the parties.  Unlike Mr.

10   Barnes, Mr. Davis determined that it was unnecessary to subtract any mitigating earnings plaintiff

11   may have received after his interest in FERS had vested.  Mr. Davis explained that once

12   plaintiff's interest in FERS had vested, he would be entitled to receive those benefits regardless of

13   whether he remained with the VA.  Upon vesting, he could switch to the private sector, or even

14   leave the practice of medicine.  It simply would not matter; he would still be entitled to receive

15   the FERS benefits based on service credits for the two additional years in question.  As Mr. Davis

16   articulated it:

17              The short of it is that what Dr. Bonzani lost was the FERS pension
                at the time of vesting.  Once he was vested – so that would have
18              been two more years -- really he could do anything, and it wouldn't
                change my number.  So the important part was I only had to make
19              the assumption that he would have stayed two more years with the

20   _____

21       [45]  Mr. Barnes testified that this figure was not accurate because Mr. Davis relied on
     erroneous assumptions.  For example, in calculating plaintiff's FERS benefits, Mr. Davis
22   assumed that plaintiff's salary for 2012 would have increased by 4.6 percent from the prior year.
     Testimony at trial indicated that there was no increase in salary for anesthesiologists in 2012.
23   Although Mr. Barnes testified that such an assumption impacted Mr. Davis's calculation,
     defendants did not produce any evidence specifically indicating the degree to which the
24   assumption impacted Mr. Davis's conclusion that plaintiff's FERS benefits totaled $657,238 or
     elicit testimony as to how that figure should be adjusted, if at all, to account for the 2012.  Thus,
25   the court declines to do so.

26       [46]  For plaintiff to be eligible for a FERS benefit, he would have to work two additional
27   years and buy back a percentage of his military earnings and pay back approximately $6,700 he
     cashed out of FERS when he left the VA.  Mr. Davis's calculation accounted for the need to pay
28   back these funds in order to receive FERS benefits.

1    VA and after that no more assumptions.  So that was fairly certain
2    to me.

3    Davis Tr., ECF No. 193 at 4.

4    After careful consideration of the testimony in light of all the other evidence in the record,

5    the court finds Mr. Davis's opinion more persuasive.  Plaintiff testified that he did not have a plan

6    regarding how long he intended to stay at the VA.  But he was clear that he intended to stay with

7    the VA at least until his FERS benefits vested.  That was a motivating factor in taking the job.

8    There was also testimony indicating that he expressed some interest in employment in the private

9    sector and it is not unreasonable that he would have done so after vesting in FERS.  The evidence

10   also conclusively showed that the VA had difficulty attracting and maintaining anesthesiologists.

11   Thus, it is entirely reasonable to project that plaintiff would eventually leave the VA for private

12   practice, but not before he had vested in FERS.

13   Mr. Barnes's opinion is predicated on an assumption that discounts plaintiff's plans in that

14   regard.  The court credits plaintiff's testimony and, according finds Mr. Davis's assumption to be

15   more credible than that of Mr. Barnes.  Although he did not address it, Mr. Barnes' reliance on a

16   straight comparison of the earnings between the VA and the private sector also fails to account

17   for testimony that temporary appointments, such as plaintiff's, could only be renewed for up to

18   six years.  After that, the VA would have to request and receive approval to have a permanent

19   position created.  While there was no evidence presented regarding the difficulty involved in

20   obtaining a permanent position, this is simply one more hurdle to plaintiff spending his remaining

21   workdays at the VA.  Mr. Barnes' assumption is simply contrary to the credible testimony by

22   plaintiff as to his motivation for going to work with the VA after leaving his military service and

23   his desire to at some point leave for private practice.  Thus, the court finds it inappropriate to rely

24   on a straight comparison of the earnings between the VA and the private sector when the

25   evidence indicates that plaintiff would have left the VA sometime after his FERS benefits vested.

26   Defendants argues that compensating Bonzani for the loss of FERS benefits would

27   amount to a windfall because "there is nothing to prevent plaintiff from taking the FERS benefits

28   front pay award now, then obtaining federal employment, working for two more years, buying

back his military time and repaying his FERS refund, and vesting in FERS."  ECF No. 180 at 18.

Defendants presented no evidence regarding the likelihood of future employment with the federal

government.  Further, the chances of plaintiff resuming employment with the VA are remote at

best.  As defendants elsewhere argue, plaintiff had explored the possibility of employment at a

private hospital and after his employment with the VA was terminated he secured a job in the

private sector at a substantially higher salary.[47]  Indeed, there was testimony that the salary

differential is a significant reason why the VA has difficulty recruiting anesthesiologists.

Finally, plaintiff was terminated from his employment under less than amiable circumstances.

He subsequently filed this suit against his former employer and the litigation has at times been

acrimonious.  No evidence was presented regarding the future availability of other federal

positions for an anesthesiologist and the likelihood that plaintiff would accept it.  While some

assumptions are required to calculate plaintiff's loss from being terminated two years prior to

vesting in a FERS benefit, the court declines defendants' invitation to engage in sheer speculation

over whether plaintiff would ever in the future return to federal service, and if so, how the

administrators of the FERS would account for the award made in this litigation.

 For the reasons stated above, whether it is characterized as front pay or simply damages,

the court finds, as did the jury, that plaintiff sustained a loss in the amount of $675,238 based on

defendants' interference with plaintiff's FMLA rights.

IV. Defendants' Motions

 After trial, defendants moved for judgment as a matter of law and for a new trial on

plaintiff's FMLA claims.  As explained below, both motions are denied.

 Judgment as a matter of law should be granted if "a reasonable jury would not have a

legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1).

/////

/////

---

[47]  Much of defendants' argument that plaintiff has no damages was premised on the
assertion that plaintiff is better off financially in the private sector.  That was the very theme of
Barnes' testimony.

1   The court must not disrupt a jury's verdict that "is supported by substantial evidence, which is

2   evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary

3   conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

4       The motion "may be made at any time before the case is submitted to the jury." Fed. R.

5   Civ. P. 50(a)(2).  If the court does not grant the motion, "the court is considered to have submitted

6   the matter to the jury subject to the court's later deciding the legal questions raised by the

7   motion." Fed. R. Civ. P. 50(b).  However, regardless of timing, judgment as a matter of law is

8   not proper unless "the evidence permits only one reasonable conclusion and the conclusion is

9   contrary to that reached by the jury." *Ostad v. Or. Health Sci. Univ.*, 327 F.3d 876, 881 (9th Cir.

10  2003).

11      Similarly, Federal Rule of Civil Procedure Rule 59 permits granting a new trial if the

12  jury's verdict is clearly contrary to the evidence.  Rule 59 provides that a "court may, on motion,

13  grant a new trial on all or some of the issues . . . after a jury trial . . . ."  However, the court "may

14  grant a new trial only if the verdict is against the clear weight of the evidence, and may not grant

15  it simply because the court would have arrived at a different verdict."  *Pavao*, 307 F.3d at 918.

16  Generally, "[c]ourts do not grant new trials unless it is reasonably clear that prejudicial error has

17  crept into the record or that substantial justice has not been done, and the burden of showing

18  harmful error rests on the party seeking the new trial." 11 Wright & Miller, et al., *Federal

19  Practice & Procedure* § 2803 (3d ed. 2015).  A court should, however, grant a new trial where

20  necessary "to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729

21  (9th Cir. 2007).  The denial of a motion for a new trial may be reversed only "if the record

22  contains no evidence in support of the verdict" or the court "has made a mistake of law."

23      Defendants have met neither standard here.  Rather, as addressed extensively above, the

24  weight of the evidence supports the finding that plaintiff's taking of FMLA leave was a negative

25  factor in the decision to not renew his employment with the VA.  The weight of the evidence

26  further supports the calculation of loss sustained from that FMLA violation.  Accordingly, there is

27  no basis for disturbing the jury's verdict and defendants' motions for judgment as a matter of law

28  and for a new trial are denied.

1    V.    Liquidated Damages

2         Plaintiff also seeks liquidated damages.[48]  ECF No. 118 at 7.  Absent a showing by the

3    defendants that such damages should not be awarded, they are required by the statute.  "The

4    FMLA is unambiguous that once it is determined that an employer violated the statute, liquidated

5    damages *will be awarded* unless the employer proves both 'good faith' and 'reasonable grounds

6    for believing that [its action] was not a violation' of the FMLA."  *Traxler*, 596 F.3d 1015

7    (emphasis added) (citing 29 U.S.C. § 2617(a)(1)(A)(iii)).  It is the employer's burden of

8    demonstrating that liquidated damages are inappropriate.  *Id.*

9         As previously discussed, the court is convinced that Dr. Hundahl's primary consideration

10   in executing his duties as Chief of Surgical Services was providing needed medical care to

11   veterans.  That motivation itself is commendable.  But while his overall goal was commendable,

12   his actions at issue here were not.  Based on all the evidence presented at trial, the court cannot

13   find that the decision to terminate plaintiff's employment was made in good faith and that

14   defendants had a reasonable ground for believing that terminating plaintiff's employment was not

15   a violation of the FMLA.  There is no dispute that plaintiff was entitled to take leave for surgery,

16   and the evidence presented at trial clearly demonstrated that he was fired for taking this protected

17   leave.  The court is firmly convinced that the frustrations and ultimate breakdown of the working

18   relationship with and termination of plaintiff was the direct result of plaintiff having been absent

19   for an extended period while he had surgery.[49]  Although plaintiff's absence may have hindered

20   the VA's ability to provide patient care, he was nevertheless entitled to the leave and could not be

21   terminated for exercising his rights under the FMLA.  Yet he was terminated knowing that the

22   absence was to have surgery.  As another court has characterized the matter, while it is true that

23   _____

24        [48] "The FMLA contains a 'liquidated damages' provision, subjecting an employer who
     violates the Act to double damages unless the employer can provide that its employment action
25   was taken in 'good faith' and that it had 'reasonable grounds for believing that [its action] was not
     a violation." *Taxler*, 569 F.3d at 1015 (quoting 29 U.S.C. § 2617(a)(1)(A)(iii)).

26        [49] The single paragraph of defendants' brief addressing this question argues that
27   defendants acted in good faith because the termination "had nothing to do with [plaintiff's]
     medical leave . . . ." ECF No. 141 at 22.  For all of the reasons listed above, the jury found, and
28   the court now finds that it did.

Dr. Hundahl may not have specifically intended to violate Dr. Bonzani's FMLA rights,

"[d]efendant was clearly willfully indifferent to [p]laintiff's FMLA rights." *Gresslett v. Central*

*Arizona Water Conservation District,* 2015 WL 1505774, *3 (D. Ariz. March 31, 2015).  Such

circumstances do not permit a finding that defendants acted in good faith and had reasonable

grounds for believing that their conduct did not violate the FMLA.

Accordingly, liquidated damages are appropriate and are awarded in the statutory

authorized amount of $675,238.

VI.    Conclusion

Defendant conceded that plaintiff was eligible for FMLA leave, that the Secretary was an

"employer" under the FMLA, and that plaintiff was entitled to the leave he took between May

and July 2009 to have surgery on his knee.  Furthermore, plaintiff has proven by a preponderance

of the evidence that Dr. Hundahl was the person who made the decision to end plaintiff's

employment because of his use for protected leave and therefore constituted an employer for

purposes of liability under the FMLA.  Accordingly, it is hereby ORDERED that:

1. Plaintiff is entitled to judgment in his favor on his FMLA claims against defendants,

jointly and severally, in the amount of $1,350,476, which represents $675,238 in actual damages

and a like amount in liquidated damages;

2. The Secretary's motion for judgment as a matter of law on plaintiff's Rehabilitation

Act claim is denied as moot;

3. Defendants' motions for judgment as a matter of law on plaintiff's FMLA claims and

for a new trial are denied; and

4. The Clerk is directed to enter judgment accordingly and close the case.

DATED:  August 13, 2015.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE